307 F.2d 458
 134 U.S.P.Q. 266
 Abraham (Abe) BAKER as an Individual and also d/b/a Simmonds
Upholstering Company, Simmonds Upholstering Co., Inc.,
Simmonds Sales System, Inc., and New England Upholstering
Co., Inc., Defendants, Appellants,
v.
SIMMONS COMPANY, Plaintiff, Appellee.
 No. 5962.
 United States Court of Appeals First Circuit.
 Heard May 2, 1962.
Decided July 20, 1962.
 
 C. Keefe Hurley, Boston, Mass., with whom Earle C. Cooley, Boston, Mass., was on brief, for appellants.
 Francis A. Even, Chicago, Ill., with whom William E. Anderson, Chicago, Ill., Michael S. Dukakis, Boston, Mass., Soans, Anderson, Luedeka & Fitch, Chicago, Ill., and Hill, Barlow, Goodale & Adams, Boston Mass., were on brief, for appellee.
 Before HARTIGAN and ALDRICH, Circuit Judges, and GIGNOUX, District judge.
 HARTIGAN, Circuit Judge.
 
 
 1
 This is an appeal from an injunction issued by the District Court of the United States for the District of Massachusetts on November 16, 1961, in an action involving trademark infringement and unfair competition.
 
 
 2
 Plaintiff, appellee-- the Simmons Company-- is one of the nation's leading manufacturers of mattresses and box springs. Plaintiff's predecessor company first began manufacturing beds and bed springs for the public under the name Simmons in 1899. In 1959 plaintiff had a business volume of $132,600,000. It now sells approximately twenty per cent of all the mattresses sold in the United States. Simmons average annual advertising expenditures is about $2,000,000. While it manufactures furniture for a variety of purposes and rooms, the overwhelming majority of its productive efforts and advertising are directed towards the marketing of products possessing a 'sleep feature.'[1]
 
 
 3
 Every product leaving the plaintiff's plants bears the name 'Simmons.' On objective record evidence, it was demonstrated that the Simmons name is well known to the American public, and its reputation is good.
 
 
 4
 The individual defendant's name is Abraham Baker. Baker is the sole owner of two of the corporate defendants, Simmonds Upholstering Co., Inc., and New England Upholstering Co., Inc. He also held the controlling shares in the Simmonds Sales System, Inc. All corporate defendants were organized uner the laws of Massachusetts. Defendants are in the reupholstering business and their history is as follows:
 
 
 5
 In 1935 Baker opened a retail furniture business in Lawrence, Massachusetts, under the name 'Baker Furniture Co.' This venture, under the Baker name, apparently continued as a small retail outlet until 1945. Some time around 1940, Baker started a reupholstering operation as an adjunct to and in the same building as his furniture business. This new venture was styled the 'Simmonds Upholstering Company.' At the time that the 'Simmonds' name was selected, the Baker Furniture store was solvent and according to Baker's testimony enjoyed a good reputation in the community.
 
 
 6
 Baker operated the 'Simmonds Upholstering Company' as a sole proprietorship until 1952. In that year, defendant Simmonds Upholstering Co., Inc., which had been incorporated in 1950, became active in the reupholstering business. This corporation serves as the vehicle for selling reupholstering service to the public, purchasing fabrics, delivering the finished product, and financing the entire reupholstering operation. Defendant, New England Upholstering Company, is the manufacturing branch of Baker's corporate group and does the actual reupholstering. Defendant, Simmonds Sales System, Inc., now defunct, was organized in 1950 for the purpose of granting franchises to individual established reupholsterers so that they might operate under the name 'Simmonds Upholstering Company.' Franchises were granted in New York City and Albany, New York, New Jersey and in Pittsburgh and Detroit.
 
 
 7
 The advent of World War II, with its restrictions on the production of new living room sets possessing springs, proved a great boon to the reupholstering business. Baker's operations expanded significantly during this period and have continued to prosper through the years. In 1959 the defendants' annual volume from reupholstering services was $2,486,546.80.
 
 
 8
 With the demise of its franchise system the defendant's market for reupholstering service is concentrated primarily in the New England states and in the area of Albany, New York. Defendants advertise extensively throughout this area through the media of newspaper, radio, television and direct mail. Defendants do not maintain retail outlets for their reupholstering services but rely on home calls by the Simmonds sales force. In defendants' words, the thrust of the Simmonds advertising is to offer 'such an attractive combination of low price, extra value and premiums, that the prospective customer will pick up the telephone and call a branch office to request a visit from a salesman.'
 
 
 9
 On October 10, 1958 plaintiff initiated the present action alleging unfair competition and trademark infringement and seeking to enjoin the defendants from using the name 'Simmonds' and for other relief. Defendants denied infringement, asserted the affirmative defenses of laches and estoppel, that the defendants and their predecessors had been doing business under the name Simmonds since 1899, and thus had rights in the name 'Simmonds' paramount to any which the plaintiff might have in 'Simmons.' Defendants further alleged that they neither sold nor manufactured goods of the kind manufactured by the plaintiff. Subsequently defendants amended their answer to assert the additional defense that plaintiff's 'Beautyrest' Sign Program for motels was violative of certain provisions of the Sherman and Clayton Anti-trust Acts.
 
 
 10
 In September 1960 the defendants moved for summary judgment on the basis of their affirmative defenses, supported by affidavits, interrogatories and answers, together with pre-trial depositions. Plaintiff countered with deposition testimony bearing directly on the affirmative defenses as well as revealting substantial issues of fact. The court denied the motion for summary judgment.
 
 
 11
 In a motion by the defendants for reconsideration of the court's action relative to summary judgment, the defendants admitted for the sake of the motion, all of the facts asserted by the plaintiff in any and all of the pleadings and papers, filed by the plaintiff. The court, there after, reaffirmed its denial of summary judgment as a matter of law.
 
 
 12
 Trial began on September 21, 1960. On the fifth day of trial the defendants moved again to further amend their answer to plead as a further defense an alleged violation by the plaintiff of Section 2(d) of the Clayton Act, 15 U.S.C.A. 13(d) as amended by the Robinson-Patman Act. The trial lasting fifty days ended on March 3, 1961.
 
 
 13
 On November 15, 1961 the trial court entered its findings of fact and conclusions of law and on the following day enjoined the defendants 'from using the name 'Simmonds' and from using any other name or representation which would lead the public to believe taht defendants are associated with the Plaintiff.'
 
 
 14
 In issuing the instant injunction the district court made the following crucial finding of fact:
 
 
 15
 'E. CONFUSION
 
 
 16
 '21. I find on all the evidence that the name 'Simmonds' as it has been used in the conduct of the DEFENDANT'S business is indistinguishable when spoken from 'Simmons', has been of a most confusing character, and that its use by the Defendants has not only in the past, but is likely in the future to cause confusion among the purchasing public in New England and elsewhere.'
 
 
 17
 This finding and the ramifications thereof are central to the present action.
 
 
 18
 In an action for infringement of a protected trademark or name the test is that of confusing similarity. Thus under the Lanham Act it is incumbent upon a court to determine whether a defendant's use of the contested make is 'likely to cause confusion or mistake or to deceive purchasers as to the source of origin of (the plaintiff's) such goods or services.' 32(1),15 U.S.C.A. 1114(1). Moreover, 'What has been said respecting infringement applies as well to the cause of action for unfair competition, which is but a somewhat broader phase of the same wrong. The gist of this action is the likelihood that the goods of the defendant will be passed off as those of the plaintiff. (citing cases).' Standard Brands v. Smidler, 151 F.2d 34.' 37 (2 Cir. 1945). In sum, both actions, i.e., trademark infringement as well as unfair competition, in addition to according legal protection to the property right which has been established in a given name, seek to insure that the public is not misled into purchasing or utilizing goods or services different from those sought by the pull and lure of a subtly devised parody of a familiar name or symbol. To put it more directly, one cannot ride on the coattails of another's reputation where the indicia of that reputation is legally protected. As was stated in LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 118 (2 Cir. 1946), cert. den. 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663:
 
 
 19
 'The Supreme Court has pointed out the law's recognition of 'the psychological function of symbols' in protecting trademarks, adding that once the owner has impregnated 'the atmosphere of the market with the drawing power of a congenial symbol' then the owenr can obtain redress 'if another poaches upon the commercial magnetism of the symbol he has created.' Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381.'
 
 
 20
 Plaintiff's trademark 'Simmons' is registered in the United States Patent Office under Registration No. 137,699 dated November 30, 1920, Renewed November 30, 1940; Registration No. 532,319 dated October 24, 1950 and Registration No. 548,280, dated September 18, 1951.[2]
 
 
 21
 With the 'Simmons' name in the market place since 1899 trademarked since 1920, and enjoying a good reputation for quality sleep and allied products, the question is whether the advent of a reupholstering firm styled 'Simmonds' in the 1940's had the proscribed proclivity of engendering a 'likelihood of confusion' in the public mind. The district court held that such proclivity existed. We agree with that finding.
 
 
 22
 Defendants' attack on the trial court's finding of likelihood of confusion takes several tacks. Initially, defendants dwell at length on asserted distinctions between the operations of Simmons and Simmonds, arguing that the cumulative effect of these distinctions militate against the likelihood of a misled or duped public. These alleged distinctions range from the obvious, e.g., Simmons as a manufacturer of new sleep products to Simmonds as a purveyor of reupholstering services, down through the more attenuated ones of the nature and purposes of advertising and class of clientele of the respective parties. The upshot, in defendants' view, is that the dissimilarity in product use and marketing practice exclude the likelihood of substantial consumer confusion.
 
 
 23
 We can bypass consideration of the inferences to be drawn from a lack of strict functional interhangeability[3] because the zone of protection which the law extends in this area is far broader and frequently reaches to the area of what might be termed noncompeting goods. Thus producers of 'v-8' vegetable juice cocktail could enjoin the use of 'V-8' vitamin tablets. Standard Brands v. Smidler, supra. Manufacturers of the 'Yale' lock could enjoin attempted introduction of a 'yale' flashlight, Yale Electric Corporation v. Robertson, 26 F.2d 972 (2 Cir. 1928); as could the producer of fountain pens compel a similar result in the case of a razor blade manufacturer. L. E. Waterman Co. v. Gordon, 72 F.2d 272 (2 Cir. 1934). In fine, 'the protection which the law gives the owner of a trade-mark is not confined to the goods upon which it is, or has been, used by the owner of it but extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark. His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to taht extent beyond his control. Unless the use by that other is upon goods so unlike his own or in territory so far from that which he has exploited that it will not create confusin, it will be enjoined.' Standard Brands v. Smidler, supra, 151 F.2d at 37.
 
 
 24
 We feel that upon a consideration of the totalities of the environmental and marketing context that reupholstering services and the production of mattresses and allied sleep products possess a relationship sufficiently viable to invoke the familiarly accepted legal principles outlined above. Standard Brands v. Smidler, supra; L. E. Waterman Co. v. Gordon, supra; Yale Electric Corporation v. Robertson, supra. See Triangle Publications v. Rohrlich, 167 F.2d 969 (2 Cir. 1948); Hanson v. Triangle Publications, 163 F.2d 74 (8 Cir. 1947); Restatement, Torts, 731.
 
 
 25
 Assuming, then, a relationship sufficient for protection, defendants next argue that plaintiff introduced no 'competent' evidience on the pivotal question of confusion. As noted above, the trial of this case occupied some fifty days of litigation, during which time the court, sitting without a jury, admitted a plethora of evidence on the confusion issue, over the objection of the defendants and subject to a motion to strike at the close of the trial, which motion was ultimately denied. On appeal, defendants center their attack on the admission of much of the evidence.
 
 
 26
 While we believe taht several of the defendants' evidentiary points are well taken and that consequently protions of the evidence should have been excluded, a careful review of the voluminous record of trial convinces us that there was sufficient competent and substantial evidence adduced at the trial to satisfy the standard of a likelihood of confusion and to render the admission of some disputed evidence non-prejudicial.
 
 
 27
 Actual examples of confusion were not required. LaTouraine Coffee Co. v.Lorraine Coffee Co., supra; George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536 (2 Cir. 1944). And the competent evidence of record denoting confusing similarity amply satisfies us that the findings of the district court on the question of a likelihood of confusion are not clearly erroneous.
 
 
 28
 At the trial four former Simmonds employees testified as to instances of the confusing similarity which they had personally experienced relative to the respective names. A certain William Canner, formerly in charge of the over-all sales operation of defendant, Simmonds Upholstering Co., testified that he recalled instances when potential Simmonds customers would inquire of him as to whether the defendant was the Simmons Mattress Company. He stated that he received these inquiries at such various places as Boston and Lawrence, Massachusetts, Albany, new York, and Hartford, Connecticut. David Levine, who had formerly been in charge of training the entire Simmonds sales force, also testified that he had received inquiries from potential customers as to the connection between the Simmonds Upholstering Company and the Simmons Company Lucien Jutras, one-time Simmonds sales manager for the State of Maine and a portion of New Hampshire, also testified as to inquiries which he had received as to the connection between Simmons and Simmonds. Finally, Wilfred Dupuis who had served as Simmonds' office manager in Hartford, Connecticut, and later as a Simmonds salesman in Lowell, Massachusetts, also confirmed personal experiences denoting potential customer confusion obtaining between the Simmons-- Simmonds name.
 
 
 29
 Among the literature which the Simmonds Comapny produced for its sales trainees was a booklet entitled 'Questions and Answers; Objections and How to Overcome Them.' The purpose of this booklet was stated therein: 'The mark of a successful salesman is to have a convincing answer at the tip of his tongue to any question or objection which a customer may offer. Very often such questions or objections can be anticipated by the trend of conversation and these objections can easily be knocked out by a complete knowledge of your subject.'
 
 
 30
 Thereafter, the very first question which the Simmonds Company apparently felt it essential that the salesman anticipate was the following:
 
 
 31
 'Q. Are you the Simmons Mattress Company? A. No, Mam, we are the Simmonds Upholstering Company, the world's largest reupholsterers. The Simmonds Mattress Company is a good company, the leaders in the mattress field. We are the world's largest and the leaders in the reupholstering filed.'
 
 
 32
 There is little question that the sample customer inquiries and suggested replies contained in the foregoing booklet, which was introduced at the trial, were based on past salesmen's experience. The fact that the very first question to be 'anticipated' by the Simmonds salesman dealt with the relationship between Simmons and Simmonds speaks volumes as to the doubtful state of the public mind on this question and on the frequency with which the question was raised. Proclivity towards confusing similarity cannot be gainsaid.
 
 
 33
 Baker himself readily recognized the names Simmons and Simmonds as a fertile source of potential confusion to prospective customers. From 1951 through 1957 in Providence, Rhode Island, one Abraham Adler operated businesses styled variously as 'H. Simmons Upholstering Co.' and 'H. Simmons Decorators.' In October 1957 in the Superior Court of Rhode Island, defenant Simmonds Upholstering Co., Inc., successfully enjoined Adler from using the Simmons name in connection with his enterprises. The bill of complaint in the Rhode Island action, introduced here, was personally signed by Baker. It states in effect that the name Simmons and Simmonds are one and the same or at least would be regarded as such by prospective customers in the relevant market. In the language of defendant's complaint:
 
 
 34
 ('Simmonds Company states) * * * that the use of these names (Simmons) as associated with this particular business tends to mislead, confuse and deceive the general public and the customers of your Complainant because (a) the business operations of the Respondent under both said trade names are of the same type as those carried on by your Complainant, and because (b) the Respondent has appropriated the name of your Complainant, Simmonds, and is using it in said business operation as 'Simmons,' which is phonetically the same although spelled slightly different.'
 
 
 35
 '6. That your Complainant has no business connection with the Respondent, but the use of said name, Simmons, by the Respondent has and will continue to deceive, confuse and mislead your Complainant's customers and the general public to believe that the Respondent is affiliated with or authorized to deal for your Complainant, when, in fact, no such affiliation or authorization exists.'
 
 
 36
 All of the foregoing evidence supports the trial court's finding of a likelihood of confusion. However, it is clear from his opinion that the district judge also predicated his finding of a likelihood of confusion on his own comparison of the respective names. Thus he stated that 'the name 'Simmonds' as it has been used in the conduct of the Defendant's business is indistinguishable when spoken from 'Simmons."
 
 
 37
 It appears that in this class of case it is open to a trial judge, drawing on his own experience and observation, to make an informed judgment as to the likelihood of confusion apt to be spawned by strongly analogous symbols. Compare Eastern Wine Corporation v. Winslow-Warren, Ltd., 137 F.2d 955 (2 Cir. 1943) with LaTouraine Coffee Co. v. Lorraine Coffee Co., supra. See Kaplan and Brown, Cases on Copyright, Unfair Competition, and Other Topics Bearing on the Protection of Literary, Musicial and Artistic Works, (1960 ed.), p. 492. Of course in this situation where the district court makes such a comparative appraisal, to the extent that his conclusions are based 'solely on the names themselves, we are in as good a position as the trial judge to determine the probability of confusion.' Eastern Wine Corporation v. Winslow-Warren, Ltd., supra, at 960.
 
 
 38
 In the present case we have no hesitation in confirming the district court's conclusion. With the exception of the letter 'd' occurring as its penultimate character, 'Simmonds' is identical in spelling with Simmons. What was said in LaTouraine Coffee Co. v. Lorraine, supra, is equally applicable here:
 
 
 39
 '* * * Defendants have attempted to distinguish 'Lorraine' from 'LaTouraine' on the basis of the number of letters and syllables in the words, but this form of technical gymnastics is not determinative. The initial letters and the last syllables-- probably the parts of any word which impress themselves most firmly upon the memory-- are identical. * * *' Id., 157 F.2d 117.
 
 
 40
 Even in the mouths of defendant's agents at the trial the two words came forth as phonetic twins. Perhaps on the tongues of linguists or precisionists, variations of articulation could be perceived. However, to the ear of the average person the two names would pass as one. Similarly, we believe that few but the discriminating of eye would, upon visual examination, readily perceive the subtle spelling gradation obtaining between the two names. In sum, on its face, we believe that the name Simmonds is inherently capable of generating confusing similarity with the name Simmons.
 
 
 41
 Finally, there is another aspect to this case which impinges on the question of infringement and its corollary-- confusion. That factor relates to the good faith of the defendant Baker in electing to do business under the 'Simmonds' name. If it can be shown that the selection of a name or symbol is part of a calculated or preconceived plan to play on the drawing power of a 'congenial symbol' then this factor will assuredly enhance a plaintiff's position on the issue of likelihood of confusion. LaTouraine Coffee Co. v. Lorraine Coffee Co., supra; Eastern Wine Corporation v. Winslow-Warren, Ltd.,supra; Restatement of Torts, 729(b) and comment (f).
 
 
 42
 We believe that the prsent record amply sustains the trial court's finding that at the time Bkaer embraced the 'Simmonds' name he was aware that the symbol was likely to lead to cofusion. Confusion, it might be added, which could only inure to his benefit.
 
 
 43
 Baker testified that he was aware of the Simmons name and its reputation at the time that the Simmonds name was selected. Inasmuch as Baker had been engaged in the retail furniture business for a number of years, any other reply would have been unworthy of belief.
 
 
 44
 As noted previously, in Baker's own testimony, at the time that he commenced his reupholstering operation, the Baker Furniture Store enjoyed a good name and reputation in the Lawrence, Massachusetts, area. Despite this fact, he eschewed the Baker name (and, if his testimony is to be credited, 'Baker's' presumptive good will and customer allegiance) for the 'Simmonds' designation upon expanding into the reupholstery field. No one in the Baker family or employ could lay claim to the 'Simmonds' name and there was no discernible reason-- apart from the reason supplied by this litigation-- why the name 'Simmonds' should have been selected.
 
 
 45
 Testifying at the trial on the selection of the name, Canner, Baker's right hand man in the early stages of the business, could only say:
 
 
 46
 'Q. * * * I ask you again, did you have any earlier discussions with Mr. Baker as to this name, the Simmonds Upholstering Company, for this business? A. You mean as to how we arrived at that name?
 
 
 47
 'Q. Did you discuss it-- this name with Mr. Baker? A. We discussed what name we might use.
 
 
 48
 'Q. When did you discuss this? A. That before we started up, or six months after, when I came to work for him.
 
 
 49
 'Q. Did you discuss the name Simmonds Upholstering Company at that time? A. Well, yes, we discussed several names. We thought we would use a name that would be a good name.
 
 
 50
 'Q. How did you arrive at the name Simmonds Upholstering Company? A. That was Mr. Baker's choice of a name.'
 
 
 51
 Baker's nomination of 'Simmonds' as his choice for a 'good name'-- a name without connection to himself or family-- can thus be either put down to a flight of imaginative fancy or to a calculatedly deliberate attempt to trade on a name well known in the market palce. We believe the record compels the acceptance of the latter.
 
 
 52
 We are confirmed in our belief that Baker acted in bad faith by his brazen attempt to establish rights in the Simmonds name extending back to 1899, the very year that plaintiff and its predecessors began to use the name Simmons, by means of a false and spurious bill of sale which Baker used to deceive the Boston Better Business Bureau and the Superior Court of Rhode Island.[4]
 
 
 53
 For all of the foregoing reasons we believe that the finding of the district court on the likelihood of confusion is amply supported by the record.
 
 
 54
 We turn then to defendants' contention that plaintiff's 'Motel-Hotel Sign Program' violated the anti-trust laws of the United States-- specifically Section 3 of the Clayton Act, 15 U.S.C.A. 14 and Sections 1-3 of the Sherman Act, 15 U.S.C.A. 1-3. Defendants argue that if it can be demonstrated that plaintiff has violated the anti-trust laws, then under Section 33(b)(7) of the Lanham Act, 15 U.S.C.A. 1115(b)(7), this violation will serve as an absolute defense to plaintiff's suit on its trademark.
 
 
 55
 The relevant facts bearing on defenants' contention may be briefly summarized as follows. Since 1954 plaintiff has had available for lease to qualifying hotels and motels a sign bearing the legend 'Sleep Best on Beautyrest by Simmons',[5] as well as roadside signs bearing the trademark 'Beautyrest' together with the name of the motel. Since 1958 the wording on this sign has been changed to read 'Ask for Beautyrest By Simmons.'
 
 
 56
 Under the plaintiff's program the sign was leased or licensed to the motel owner for a fee of $15.00 (a loss figure to plaintiff provided that the individual owner complied with certain conditions stipulated by plaintiff. The most critical condition of the program, as viewed by defendants, was the fact taht the signs would only be leased to and displayed by motel owners who were fully equipped with plaintiff's 'Beautyrest' mattresses. Thus, the owner who wsa already fully equipped with Beautyrest mattresses might immediately obtain the sing and participate in the program. An owner who was not so equipped could not obtain the sign until he changed to Beautyrest.[6] Moreover, an owner who at one time had a full complement of Beautyrests and thus qualified for the program would have to return the sign and drop out of the program upno the use of a rival mattress in his establishment.
 
 
 57
 The record indicates that plaintiff annually circularizes the motel-hotel trade to alert it to the existence of its sign program and, in a further effort to promote the program, runs an advertisement in a natioanl magazine inviting the traveling public to stop at motels displaying plaintff's sign. The names of the participating establishments-- those who have the signs and are thus equipped with Beautyrests-- are contained in this ad.
 
 
 58
 The thrust of defendants' argument is that the plaintiff's sign program constitutes an illicit 'tying' arrangement in which the sign constitutes the 'tying' product and the Beautyrest mattress the 'tied' product. Through this device, under defendants' view, the plaintiff has effectively blocked off and foreclosed a substantial segment of the mattress market from plaintiff's competitors.
 
 
 59
 Section 3 of the Clayton Act, 15 U.S.C.A. 14, dealing with tying arrangements provides as follows:
 
 
 60
 'It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for useConsumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. Oct. 15, 1914, c. 323, 3, 38 Stat. 731.'
 
 
 61
 Tying arrangements are condemned under Section 1-3 of the Sherman Act as 'contracts in restraint of trade.'
 
 
 62
 While we must confess to having experienced some initial reluctance to accept defendants' contention that the plaintiff's sign program might, undr any view, be considered a tying antitrust statutes, within the meaning of the antitrust statutes, reflection has persuaded us that strictly speaking the program might be said to fall within the literal language of the Act. Having thus concluded, defendants urge that the sign program shouild be struck down as 'per se' illegal under the cited statutes as they have been construed by the Supreme Court.[7]
 
 
 63
 On the facts of the record we cannot accept defendants' position. Thus while we believe taht the instant arrangement may well fit within the generic label of a 'tying' device, we are not at all convinced that it is an improper one. As we stated in Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1 Cir. 1961), cert. den. 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194: 'We may agree with the plaintiff that the compulsory joining of two 'separate' articles is a per se violation of the act. This statement, however, solves nothing.' In that case, construing certain language in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and relying on United States v. Jerrold Electronics Corporation, 187 F.Supp. 545 (D.C.E.D.Pa.1960), aff'd Per Curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), we held that business arrangements which conceptually could be styled 'tie-ins' might be exculpated from the reach of the anti-trust laws if the arrangement was actuated by or could be explained on the basis of a legitimate business justification as opposed to an improper motive, e.g., desire to increase market control through the economic leverage supplied by the tying arrangement.
 
 
 64
 We believe that in the instant case the motive actuating the requirement that an establishment displaying the Simmons sign possess all Simmons products is clearly within the exculpating principles outlined in Dehydrating Process and Jerrold, supra.
 
 
 65
 Focusing, for the moment, solely on the 'tying product,' we may start with the assumption that it was a desirable and legitimate aspiration of the Simmons Co. that its signs be hung on as many quality motels and hotels as possible. The signs served a bona fide advertising purpose and, presumably the greater the exposure accorded the Simmons name the more salutary would be the resultant impact on its business. Simmons could assuredly take active steps in the endeavor to foster this end.
 
 
 66
 Similarly when viewed from the aspect of the motel owner-- at least those embracing the program-- the Simmons sign was assuredly regarded as a genuine asset. Undoubtedly it was deemed a real, if subtle, inducement to the prospective tourist and a veiled assurance to those familiar with the Simmons name that a stop at the motel in question would insure a restful night's sleep. Again, to the owner thus disposed, it was an entirely legitimate aspiration that he obtain a Simmons sign.
 
 
 67
 Therefore, viewed in vacuo, plaintiff had the right to effect a widespread dissemination of its advertising and the individual owners undoubtedly had a coequal right to hang the signs. Defendants do not nor could they quarrel with these rights. It is only when the signs are 'tied' to the mattresses that they dispute their validity.
 
 
 68
 However, if 'tie' be the word, then we believe that plaintiff had an eminently legitimate interest to protect in 'tying' or conditioning the use of the signs on the purchase of its mattresses. There is no question that a legend appearing on a motel which invited the travelling public to 'Sleep Best on a Beautyrest by Simmons' would be accepted at face value-- as surely it is intended-- that the motel features the Simmons mattresses on its beds. Quite obviously if the motel in fact did not have the Beautyrest mattress in its rooms but rather had an inferior brand, then the Simmons name, reputation and good will predictably might well suffer. In short, where the clear import of the sign program was to convey the message that a Beautyrest awaited the traveler inside, the Simmons Co. had ample justification in seeking to insure that the realization met this expectation. Simmons had a right, indeed a duty, to insure the truthfulness of its advertising and to exclude the possibility that a careless or capricious innkeeper might shortchange his guests with a different mattress.
 
 
 69
 Thus we feel that while the instant arrangement might technically be deemed a tie-in, we do not belive that it is an illegal one nor one which presents the evils at which the anti-trust statutes were aimed.
 
 
 70
 Defendants also contend that one of the plaintiff's co-operative advertising plans was violative of Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson Patman Act. It is defendants' contention that this program as carried out by Simmons conferred advertising advantages upon the larger retail outlets that were not available to smaller stores. Defendants' attack centers upon the adequacy of the notice concerning the program received by the smaller Simmons dealers. Upon careful consideration of the entire evidence bearing on this contention, we cannot say that the plaintiff indulged in any discrimination in connection with its advertising program and thus we reject defendants' arguments on this point.
 
 
 71
 In view of our determination that Simmons has engaged in no violation of the anti-trust laws, it is unnecessary that we express any opinion on defendants' contention that an anti-trust violation, if proven, would serve as an absolute defense to a trademark action under the Lanham Act.
 
 
 72
 A judgment will be entered affirming the judgment of the district court and remanding the case to that court for the allowance of counsel fees.
 
 
 
 [1]
 For example, of plaintiff's 1959 sales volume $28,000,000 was attributable to the sale of the Simmons 'Hide-A-Bed' and other dual purpose equipment which, while designed for living room use, could be quickly converted to a bed
 
 
 [2]
 Simmons' is also included under Registration No. 661,772 in combination with another of plaintiff's trademarks, 'Beauty-rest.' The mark embraced by Registration No. 661,722 is 'Sleep Best on Beautyrest by Simmons.'
 
 
 [3]
 Although on this score the record indicates that defendants regarded new furniture as their prime competitive factor and thus at least in the area of Simmons' substantial market for the living room-- based 'Hide-A-Bed,' the two concerns were face to face in direct competition. Moreover, since 1958 Simmons has operated a separate Living Room Division. It might be noted in passing that while defendants have consistently maintained that its business is the selling of reupholstering services and not the manufacture of new furniture, this distinction may be more illusory than real. The record indicates that it frequently happened that customers who sent their old living room sets to the defendants for 'refinishing' received back a new set in the sense that no constituent thereof, e.g., frame, etc. had ever before been in the customer's home
 
 
 [4]
 Defendants have argued laches as an affirmative defense. The record showed that plaintiff did not become aware of the defendants existence until the summer of 1951. At that time plaintiff's attorneys sent notice of infringement to the defendants. Evincing concern that the defendants might have a legitimate claim to the name 'Simmonds,' plaintiff inquired of the defendants' counsel whether any one in the defendants' organization bore the name 'Simmonds.' This inquiry was ignored. Thereafter, the plaintiff proceeded to monitor the activities of the defendants. In 1952 plaintiff cooperated with a Federal Trade Commission investigation which led to a 1953 cease and desist order against Baker and his associates. Plaintiff successfully opposed defendants' application for registration of the name 'Simmonds' as a service mark for reupholstering furniture in a patent office proceeding in 1957-58. The present suit was instituted on October 10, 1958
 It may well be true that plaintiff could have acted with more expedition in instituting the present suit but in view of defendants' calculated design to trade upon plaintiff's reputation and his reliance upon a fake document as to the origin of his company, we do not believe that he is in any position to invoke the defense of laches.
 
 
 [5]
 As noted above, this legend is covered by Registration No. 661,772 on file with the United States Patent Office
 
 
 [6]
 Since 1958, plaintiff has permitted motel owners who are not fully equipped with Beautyrest mattresses to display the sign provided (1) they agree to become 100% equipped with such mattresses within five years and (2) when applying for the lease order at least 20% of the number of such mattresses. The fact that during this transitional period a given hotel or motel might be only partially equipped with Beautyrests undoubtedly accounts for the change in the signs' message from 'Sleep Best On Beautyrest By Simmons' to 'Ask for Beautyrest By Simmons.'
 
 
 [7]
 The concept a 'per se' violation in connection with tie-in contracts was articulated in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). In that case the International Salt Co. would only lease its patented salt-dispensing machines upon the condition that the lessees purchase all the salt that might be required for use in the machines from them. In affirming a summary judgment holding the contracts to be illegal under section 3 of the Clayton Act as well as section 1 of the Sherman Act, the Court stated that it was 'unreasonable, per se, to foreclose competitors from any substantial market. * * * The volume of business affected by these contracts (a $500,000 annual volume) cannot be said to be insignificant or insubstantial and the tendency of the arrnagement to accomplishment of monopoly seems obvious.' 332 U.S. at 396, 68 S.Ct. at 15
 Thereafter the evidentiary distinctions between establishing a tie-in violation under the Clayton Act as distinguished from the Sherman Act were synthesized by the Court in Times-Picayune v. U.S., 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) in the following terms: A tie-in arrangement will violate the Clayton Act 'when the seller enjoys a monopolistic position in the market for the 'tying' product, or if a substantial volume of commerce in the 'tied' product is restrained;' and the practice will contravene the Sherman Act 'whenever both conditions are met.' 345 U.S. at 608-609, 73 S.Ct. at 880. As thus formulated a more demanding burden of proof was required under the Sherman Act.
 In Northern Pacific Railway Co. v. U.S., 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Court apparently reverted from the requirement of demonstrating the market dominance or 'monopolistic' position of the defendant and substituted the less demanding test of a 'sufficient economic power to impose an appreciable restraint on free competition in the tied product.'
 Thus in the instant case, before we might invoke any 'per se' concepts, we would have to satisfy ourselves that the volume of commerce affected by the present arrangements should be regarded as substantial within the teaching of the above cited cases. The precise volume is a matter of dispute between the parties and the district court made no specific finding on this question. The case would have to be returned to the district court for a determination of this issue. Similarly we would have to rule that Simmons' 20% of the mattress market in the United States gave them a 'sufficient economic power to impose an appreciable restraint on free competition in the tied product.' In view of our disposition of the case, neither of these questions need be decided.