DOMINION BANKSHARES CORPORATION, Plaintiff,

v.

DEVON HOLDING COMPANY, INC. and Dominion Bank, Defendants.

Civ. A. No. 87–8172.

United States District Court, E.D. Pennsylvania.

Feb. 12, 1988.

---

Arthur H. Seidel, Nancy A. Rubner, Seidel Gonda Goldhammer & Abbott, P.C., Philadelphia, Pa., James H. Dabney, pro hac vice, New York City, for plaintiff.

Joseph J. Serritella, Richard W. Foltz, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Devon Holding Co., Inc. and Dominion Bank.

Edward S. Ellers, Philadelphia, Pa., for Ryan, Beck & Co., (Deponent).

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

KATZ, District Judge.

This suit is brought under the Lanham Trademark Act, 15 U.S.C. § 1051 *et seq.*, and the Pennsylvania Trademark Act, 54 Pa.Cons.Stat.Ann. §§ 1101, *et seq.*, and the common law. Plaintiff Dominion Bankshares Corporation alleges that defendants' use of the name DOMINION BANK for the new bank that defendants seek to open, with offices in Devon and Media, Pennsylvania, infringes upon plaintiff's name and service mark DOMINION BANK. Plaintiff seeks a preliminary injunction preventing use by the defendants of the DOMINION BANK name and service mark. A hearing was held on January 14, 1988. After considering the testimony and exhibits submitted at and in connection with the hearing as well as the legal arguments of counsel, the following shall constitute the Court's findings of fact and conclusions of law.

### *Findings of Fact*

1. Plaintiff Dominion Bankshares Corporation is a Virginia corporation with its principal executive offices in Roanoke, Virginia.

2. Dominion Bankshares is a registered bank holding company. At year end 1986, Dominion Bankshares and affiliated compa-

nies had 4,088 employees, 219 full service offices in Maryland, Virginia, Tennessee and the District of Columbia, and total assets exceeding $5.9 billion.

3. Through predecessors in interest, Dominion Bank, N.A., a Dominion Bankshares subsidiary bank, has used the DOMINION BANK name and mark since 1890.

4. Dominion Bankshares has used DOMINION BANK as a trade name and as a service mark for banking services since at least 1971.

5. Since the mid–1980's all of the subsidiary banks of plaintiff Dominion Bankshares as well as all of its non-banking subsidiaries have uniformly used the DOMINION name.

6. Dominion Bankshares owns and operates numerous subsidiary banks. Each of these banks, trading as DOMINION BANK, offers a broad range of banking services to customers throughout the United States, including Pennsylvania.

7. In the last ten years, Dominion Bankshares has spent millions of dollars on advertising and promotion under the DOMINION BANK name.

8. At various times during the last 15 years, Dominion Bankshares has advertised and promoted the DOMINION BANK name and service mark in a variety of print media distributed in Pennsylvania.

9. Since at least 1986, Dominion Bankshares has advertised on Washington, D.C. radio stations that are received in numerous counties in Pennsylvania.

10. Though Pennsylvania law prohibits plaintiff from operating a physical deposit-taking institution in Pennsylvania, and from acquiring a bank in Pennsylvania, Dominion Bankshares may and does in fact conduct numerous types of banking business here. As of May 31, 1987, subsidiary banks of plaintiff Dominion Bankshares, operating under the name and service mark DOMINION BANK, had accounts with 2,949 Pennsylvania households, with a value of approximately $131,000,000.

11. As of May 31, 1987, subsidiary banks of plaintiff Dominion Bankshares, operating under the name and service mark DOMINION BANK, had 4,489 individual accounts with customers located in Pennsylvania.

12. As of May 31, 1987, subsidiary banks of Dominion Bankshares, operating under the name and service mark DOMINION BANK, had 1,953 accounts worth approximately $114,000,000 with customers in the Delaware Valley.

13. As of May 31, 1987, Dominion Bankshares, through its subsidiary banks, operating under the name and service mark DOMINION BANK, had 13 accounts with customers in Devon, Pennsylvania.

14. During December, 1987, customers of Dominion Bankshares subsidiary banks, operating under the name and service mark DOMINION BANK, used automatic teller machines at 99 different locations in Pennsylvania for over 200 transactions.

15. Dominion Bankshares, through its subsidiary banks, operating as DOMINION BANK, solicits VISA merchant accounts and VISA card customers in Pennsylvania through telephone, mail, and in some cases personal contacts with Pennsylvania residents. As of November, 1987 plaintiff held 45 VISA merchant accounts with Pennsylvania-based customers and had over 500 VISA card customers in the Delaware Valley alone.

16. Dominion Bankshares, through its subsidiaries, operating under the DOMINION name, has extended, in the past 2 years, over 500 mortgage loans to Pennsylvania customers.

17. As a result of the active solicitation for business by and on behalf of the subsidiaries of plaintiff Dominion Bankshares and the significant amount of business which they conduct in Pennsylvania many residents of Pennsylvania have become aware of the plaintiff's name and service mark DOMINION BANK.

18. As of December 31, 1987, approximately 648,000 shares of Dominion Bankshares common stock were held by Pennsylvania residents.

19. As a result of significant investment generating activity in the state of

Pennsylvania, and advertisement and promotion of the DOMINION BANK name and service mark in publications distributed to the Pennsylvania investment community as well as personal contacts, Pennsylvania-based investors have become aware of Dominion Bankshares and its activities.

20. Defendants Devon Holding Company, Inc. and Dominion Bank are Pennsylvania corporations.

21. Defendants were both incorporated in January, 1987.

22. Defendants at this time plan to open and operate a commercial bank in Devon, Pennsylvania and Media, Pennsylvania under the name and service mark DOMINION BANK. Defendant Dominion Bank plans to offer a broad range of banking services authorized under the Pennsylvania Banking Code.

23. The services that defendants plan to offer are substantially similar to the services offered by the subsidiary banks of plaintiff Dominion Bankshares.

24. Defendant Dominion Bank already has adopted and uses letterhead that bears the DOMINION BANK name.

25. Defendant Dominion Bank expects to open for business on May 1, 1988.

26. Neither of the defendants is related to or affiliated in any way with plaintiff Dominion Bankshares.

27. Neither of the defendants has ever sought or obtained from plaintiff Dominion Bankshares permission to do business as DOMINION BANK or to use DOMINION BANK as a name and service mark.

28. As of December, 1987 defendant Dominion Bank had not yet begun to conduct any banking business with customers, and had not yet accepted any deposits or made any bank loans. As of December, 1987 defendants had fewer than five employees.

29. As of December, 1987 defendant Dominion Bank had not yet begun to operate an office in which to conduct banking business.

30. The building in which defendants currently occupy office space has no external signs bearing the name DOMINION BANK, nor does the lobby directory of the building identify DOMINION BANK as an occupant of the building.

31. As of December, 1987 defendants had not yet run any print or other advertisements of themselves or their proposed banking services using the name DOMINION BANK.

32. Plaintiff notified defendants on or about December 1, 1987 that plaintiff disputed defendants' current and proposed use of the name DOMINION BANK.

33. On December 16, 1987, defendants consented to the principal relief sought by plaintiff in its original motion for a temporary restraining order against defendants' proposed use of DOMINION BANK as a name and service mark. Since that date, defendants have refrained from any further public uses of the name DOMINION BANK.

34. William H. Bromley, one of the principal founders of both defendants, has worked in banking since 1976.

35. Prior to participating in the incorporation of defendants, Mr. Bromley knew generally of the plaintiff and its banking operations under the name and service mark DOMINION BANK.

36. In or prior to November 1986, Mr. Bromley prepared a bank formation proposal (the "Dominion Plan").

37. In or prior to December 1986, Bromley presented or caused the Dominion Plan to be presented to prospective investors in the proposed bank, including R. Richard Williams, Thomas J. Scanlon, Jr., and one or more representatives of the Arthur J. Kania family trust. On or about December 18, 1986, Bromley, Williams, Scanlon, and the Trust entered into an agreement to incorporate and invest in a new bank and a new bank holding company based on the Dominion Plan (the "December 1986 Agreement").

38. As of the date of the December 1986 Agreement, the organizers of the defendant entities had not yet considered or decided on a name for the new bank.

39. The name DOMINION BANK was first suggested some time prior to January 12, 1987 by James D. Kania, another founder and the principal stockholder of Devon Holding Company. At the time he suggested the name, Kania had no experience in the banking industry.

40. On or about January 12, 1987, Bromley transmitted to each of Williams, Scanlon, and Kania a list of proposed bank names.

41. The list of proposed bank names that Bromley sent to the other organizers did not include the name DOMINION BANK.

42. Subsequent to January 12, 1987, Kania proposed that defendants adopt DOMINION BANK as a name and service mark.

43. At a meeting in late January or early February 1987 various names then under consideration were discussed. At the meeting, Bromley informed all participants of the existence of a Dominion Bank in Virginia.

44. In connection with the organizers' name selection, Bromley undertook to investigate the availability of various names, including DOMINION, for use by the defendant entities.

45. At some point during this period, Bromley informed Kania that Dominion Bankshares Corporation was a two billion dollar bank and had acquired banks in Maryland or Tennessee or both.

46. Mr. Kania was generally aware that banks in one state typically do business with customers located in adjacent states.

47. At a meeting of the defendants' organizers held in February 1987, defendants rejected the various other names that had emerged as possibilities from their previous meeting and decided on DOMINION BANK as the name and service mark for their new bank.

48. As of the time defendants adopted the name DOMINION BANK neither defendants nor their counsel had any idea of the nature or volume of plaintiff's transactions with Pennsylvania-based customers nor the extent of plaintiff's activities in Pennsylvania.

49. As of the time defendants adopted DOMINION BANK as a name and service mark for their new bank, neither defendants nor their counsel were aware of the extent plaintiff's investment generating activities in Pennsylvania.

50. Arthur J. Kania is the settlor of the Arthur J. Kania Family Trust, which is providing the bulk of the money for the defendants' formation. At the time of defendants' adoption of DOMINION BANK, Mr. Arthur J. Kania was familiar with Dominion Bankshares and its business.

51. Mr. Arthur Kania participated in the decision of defendants' organizers to adopt DOMINION BANK as a name and mark.

52. At no time prior to the defendants' adoption of the name DOMINION BANK did defendants or their counsel make any attempt to examine or locate any publicly filed documents relating to the plaintiff Dominion Banks.

53. At no time prior to defendants' adoption of the name DOMINION BANK did defendants or their counsel order a trade name or service mark search on DOMINION BANK.

54. At no time prior to defendants' adoption of the name DOMINION BANK did defendants or their counsel seek the advice of any attorney experienced in trademark law.

55. In adopting the name DOMINION BANK defendants acted with disregard of plaintiff's prior rights in and to the name and service mark DOMINION BANK in Pennsylvania.

56. Defendants have registered the name DOMINION BANK with the Pennsylvania Department of Banking.

57. The sound of the plaintiff's name and service mark is identical to that of the defendants' name and service mark.

58. The words, DOMINION BANK, constituting the plaintiff's name and service mark are identical to that of the defendants' intended name and mark, DOMINION BANK.

59. As it appears on various banking forms, the appearance of the plaintiff's mark and of the defendants' mark is identical.

60. Defendants propose at this time to solicit business in the Delaware Valley area and perhaps beyond.

61. Defendants propose to solicit business in the same ways that the plaintiff Dominion Bankshares already does, using mail and telemarketing techniques similar to those already being used by the plaintiff, as well as advertisements in print media circulated in the Delaware Valley.

62. Although defendants have not yet opened for business, actual confusion of defendants with plaintiff Dominion Bankshares has already occurred. On January 6, 1988, defendants contacted Accountline Financial Services, Inc. ("Accountline") of Jenkintown, Pennsylvania. Accountline is engaged in the business of providing information regarding the financial behavior patterns of consumers in regional markets. The company has regularly conducted business with plaintiff Dominion Bankshares since 1986, and is widely regarded as knowledgeable in the field of financial services and the institutions offering those services.

63. Michael Buchanan, the Executive Vice President of Marketing to whom the switchboard receptionist forwarded the call wrongly assumed, when told that someone from "Dominion Devon" was on the line, that the call was from one of Dominion Bankshares' bank or bank-related subsidiaries. Accordingly, he instructed the switchboard to switch defendants' representative to Dominion Bankshares' sales representative. Only during the course of the ensuing telephone conversation did the sales representative come to realize that the caller was not connected with Dominion Bankshares but was, in fact, connected with defendants.

### Conclusions of Law

1. The standard in this Circuit for the issuance of a preliminary injunction is well settled. In order to merit the granting of a preliminary injunction the party seeking injunctive relief must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured if relief is not granted. If relevant, the district court should also consider (3) the possibility of harm to other interested persons from the granting or the denial of the injunction, and (4) the public interest. *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984); *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.1980), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

### REASONABLE PROBABILITY OF EVENTUAL SUCCESS

2. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) protects a trade name regardless of whether that name is registered or unregistered. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986).

3. The two elements necessary to establish infringement under the Act and under the common law are (1) that the trademark or trade name is distinctive and therefore, protectible; and (2) that the second comer's actions cause a likelihood of confusion among the relevant consumers. *Blumenfeld Development Corporation v. Carnival Cruise Lines, Inc.*, 669 F.Supp. 1297, 1317 (E.D.Pa.1987), citing *ChiChi's Inc. v. Chi-Mex, Inc.*, 568 F.Supp. 731, 734 (W.D.Pa.1983).

4. In order to merit protection, the public must recognize the trade name as "identifying the claimants' goods or services and distinguishing them from those of others.'" *Canfield*, 808 F.2d at 296, quoting J. McCarthy, *Trademarks and Unfair Competition*, § 15.1 at 657 (2d ed. 1984).

5. Identification depends on the characterization given to the trade name. A trade name will be characterized based upon its strength and the degree to which the name or mark is distinctive. Distinctive marks are those which are arbitrary, fanciful, or suggestive. *Blumenfeld*, 669 F.Supp. at 1317.

6. An arbitrary or fanciful mark is one which bears no logical or suggestive relation to the actual characteristics of the goods or services. An arbitrary mark is entitled to maximum protection. *Blumenfeld*, 669 F.Supp. at 1317.

7. A suggestive mark is one which requires mature thought and imagination to determine the significance of the mark as it relates to the goods. *In re The Rank Organization, Ltd.*, 222 USPQ 324 (TTAB 1984).

8. Arbitrary, fanciful or suggestive marks do not require proof of secondary meaning and are protectible upon adoption. *Blumenfeld*, 669 F.Supp. at 1317; *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1364 (D.N.J.1981); *Caesars World, Inc. v. Caesars Palace*, 490 F.Supp. 818, 822 (D.N.J.1980).

9. If a mark is neither arbitrary or fanciful nor suggestive, then it is merely descriptive and will require proof of secondary meaning in order to be protectible. *Blumenfeld*, 669 F.Supp. at 1318; *American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16, 19 (E.D. Pa.1981), *aff'd*, 681 F.2d 804 (3d Cir.1982).

10. A descriptive mark conveys to the consumer the characteristics, functions, uses or qualities of the good or service. *Blumenfeld*, 669 F.Supp. at 1318; *Victoria Station, Inc. v. Clarefield, Inc.*, 458 F.Supp. 199, 202 (W.D.Pa.1978).

11. Plaintiff's use of the DOMINION trade name and service mark does not tell the potential customer the characteristics, functions, uses or qualities of its services and therefore is not merely descriptive.

12. The name DOMINION is not geographically descriptive and therefore requires no proof of secondary meaning in order to be protected.

13. Plaintiff's DOMINION trade name and service mark bears no logical or suggestive relation to the actual characteristics of the services it provides. Therefore, it is an arbitrary mark which requires no proof of secondary meaning in order to be protected.

14. Plaintiff, therefore, has a protectible interest in the DOMINION BANK name.

15. The second critical element in the determination of infringement is the likelihood of confusion. *Blumenfeld*, 669 F.Supp. at 1317.

16. The basic inquiry to be made is whether the alleged infringer has used, without prior authorization, a trade mark or service mark that is identical or similar to that used by the party asserting trademark infringement, in connection with related goods or services, and that would be likely to cause confusion or mistake, or to deceive consumers as to the source of these goods or services. *Koppers Co., Inc. v. Krupp–Koppers GmbH*, 517 F.Supp. 836, 838 (W.D.Pa.1981).

17. Likelihood of confusion should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services. *American Express Co. v. Pan American Express International, Ltd.*, 509 F.Supp. 348, 351 (E.D.Pa.1981).

18. The "likelihood of confusion" standard is reduced to only a "possibility of confusion" standard where, as here, a newcomer enters a field already occupied by a long-established business such as plaintiff Dominion Bankshares. *Blumenfeld*, 669 F.Supp. at 1319; *accord Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 908–909 (3d Cir.1952).

19. In *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978), the Third Circuit identified ten factors to be considered by a court in making its determination of likelihood of confusion. The ten factors are (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the

mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendants' market. *See Also Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462–63 (3d Cir.1983).

20. If, however, it is determined that the plaintiff and the alleged infringer deal in competing goods or services, the court may simply look at the mark itself.

21. Plaintiff Dominion Bankshares offers various types of banking services to its customers in Maryland, Virginia, Tennessee and the District of Columbia as well as to numerous customers throughout Pennsylvania. As defendants seek to operate a bank offering a wide range of similar banking services to customers in Pennsylvania, I find that the parties deal in competing services.

22. Plaintiff's subsidiary banks have operated since 1971 under the name and service mark DOMINION BANK. As defendants seek to use the name DOMINION BANK for their new enterprise, the marks are identical and a likelihood of confusion exists.

23. Even if the parties do not deal in competing services, an analysis of the ten *Scott Paper* factors indicates the possibility and the likelihood of confusion.

24. The degree of similarity between the owner's mark and the alleged infringer's mark is relevant to any determination of the likelihood of confusion. *Scott Paper,* 589 F.2d at 1229. The greater the similarity between the two marks, the greater the likelihood of confusion. *Estate of Presley,* 513 F.Supp. at 1367.

25. In this case the two marks are not only similar, in fact they are identical. "Courts view with suspicion a trade name or mark which is so close to that of

another, that the public may fail to distinguish them." *Blumenfeld,* 669 F.Supp. at 1320.

26. The identical nature of these two competing marks makes the risk of confusion quite substantial.

27. Plaintiff has a strong service mark because of the arbitrary characteristics of the DOMINION BANK name. *Blumenfeld,* 669 F.Supp. at 1317.

28. Excerpts from the *Electronic Yellow Pages* which disclose numerous entities in Virginia with the word DOMINION in their titles, are irrelevant to any determination of the market penetration of plaintiff in Pennsylvania or to the likelihood of confusion posed by defendants' use of the DOMINION BANK name and service mark here. All such lists reveal is that in Virginia there are many businesses which contain DOMINION in their names.

29. The closer the relationship between the products offered by the two parties and the more similar their sales contexts, the greater the likelihood of confusion. *Interpace,* 721 F.2d at 462. In this case the senior user, plaintiff Dominion Bankshares, offers a variety of banking services to Pennsylvania customers as well as to other customers throughout the country. The junior user, defendants Devon Holding Company and Dominion Bank seek to offer a similar variety of banking services in some of the same sales contexts. This presents a likelihood of confusion.

30. Plaintiff has, for many years, advertised and promoted its products in Pennsylvania through the use of print media and direct mail solicitation as well as through personal contacts with Pennsylvania customers. As defendants seek to employ the same media and marketing channels to promote their enterprise there is a likelihood of confusion between the two marks.

31. Defendants assert that they intend to focus their marketing efforts on individuals and small businesses, and that because many of plaintiff's customers are corporations and large commercial accounts there is no likelihood of confusion. The types of consumers that defendants

seek to target are in fact the most likely to be confused or deceived by the identical nature of plaintiff's and defendants' names.

32. The record has established that defendants (or at least some of the individuals with a pecuniary interest in and control over defendants) were aware of the existence of plaintiff and of plaintiff's use of the name and service mark DOMINION BANK. Given this knowledge prior to defendants' adoption of the DOMINION BANK name, defendants use of the name is strongly suggestive of the intention of defendants to draw from that mark. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir. 1969), *cert. dismissed*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

■■■ 33. Evidence of intent to copy a trade name or mark is circumstantial evidence of likelihood of confusion. *Baker v. Simmons Co.*, 307 F.2d 458, 465 (1st Cir. 1962).

34. In addition, in December, 1987 plaintiff notified defendants of its rights in the DOMINION BANK name and service mark and of its opposition to defendants use of that name. Defendants continued to use the DOMINION BANK name for their enterprise until the parties worked out a temporary settlement shortly after commencement of this suit. "Intent to deceive may be presumed by defendants' use of the trade mark in issue after receipt of notice of the plaintiffs' objections and the advice that such use infringed plaintiff's trademark." *Jockey International, Inc. v. Burkard*, 185 USPQ 201, 207 (S.D.Cal.1975).

35. Evidence of defendants' intent increases the likelihood of confusion between defendants' DOMINION BANK and the service mark DOMINION BANK of the senior user, plaintiff Dominion Bankshares.

■■■ 36. There has already been actual confusion of plaintiff's service mark with defendants' enterprise, despite the fact that defendants' business has not yet become operational. Actual confusion is one of the most reliable indications of the likelihood of confusion. *Louisiana World Ex-*

*position, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir.1984) (citing *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 345 (5th Cir.1984)).

■■■ 37. Similarly, because defendants, as the junior-user, have entered the market subsequent to the plaintiff they have an affirmative duty to choose a mark or a trade name so as to avoid all confusion as to the source of origin of its services. *Blumenfeld*, 669 F.Supp. at 1321 (citing *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 980 (D.N.J.1979)).

38. This duty extends to an obligation to avoid even "subliminal trademark association." Subliminal trademark association is "defendants' ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's protected name or mark." *Blumenfeld*, 669 F.Supp. at 1321 (citing *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 428 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982)).

■■■ 39. The registration by defendants of the DOMINION BANK name with the Pennsylvania Department of State has no effect on the trademark infringement rights of plaintiff. *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 857–58 (3d Cir.1975).

40. In determining the outcome of the common law claims, the District Court must apply the choice of law rules of the forum state in determining which state's law applies. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978); *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19 (3d Cir.1975).

41. Since Pennsylvania is the forum state, its conflicts rules will be used in choosing which state's common law applies to the torts of unfair competition and trademark infringement.

42. The law of either Pennsylvania or Virginia is potentially applicable to this case. Pennsylvania is where defendants have their principal place of business and where they intend to operate the potential-

ly infringing entity. Virginia is where plaintiff has its principal place of business. Injury is likely to occur in both states if defendants use the DOMINION BANK designation.

43. The landmark Pennsylvania decision in a tort action choice of law case is *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). In *Griffith*, the Supreme Court of Pennsylvania abandoned the traditional *lex loci delicti* rule in favor of a more flexible approach to choice of law which "permits analysis of the policies and interests underlying the particular issue before the court." *Griffith*, 416 Pa. at 21, 203 A.2d at 805.

44. In *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970), the Court stated that one method of determining which state has a greater interest in the application of its law is to examine the relevant contacts each state has with the tort. This should not be a mere quantitative counting of contacts, but rather a qualitative determination of which state has the more substantial interest in having its law applied. *Cipolla*, 439 Pa. at 566, 267 A.2d at 856. Applying that analysis, Pennsylvania law should be applied.

45. In Pennsylvania, the common law test for unfair competition and infringement is likelihood of confusion, which is also the test in federal trademark law. *Standard Terry Mills, Inc. v. Sten Mfg. Company*, 803 F.2d 778, 780 n. 4 (3d Cir. 1986).

46. Pennsylvania courts will examine the same ten factors in determining likelihood of confusion.

47. At trial and in depositions submitted after trial both sides have offered in evidence the testimony of experts[1] with respect to the likelihood of confusion posed to consumers and others by the defendants' use of DOMINION BANK as a name and service mark. Based upon this testimony and upon this Court's analysis of the ten *Scott Paper* factors, I conclude that defendants' intended use of the DOMINION BANK name and service mark poses a likelihood of confusion to both consumers and those who provide goods and services to the banking industry.

48. Given this Court's analysis of these factors in connection with the federal claims, plaintiff has established protectible common law rights under Pennsylvania trademark infringement and unfair competition law.

49. Plaintiff has established a reasonable probability of eventual success in this litigation.

### IRREPARABLE INJURY

50. Courts have readily found irreparable injury in cases of trademark infringement because of the loss of control over its reputation that the senior user suffers. *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.*, 414 F.Supp. 1003, 1018 (E.D.Pa.1976).

51. Regardless of the quality of the infringer's goods or services, it is this loss of control that creates the injury.

52. Erosion of goodwill or of plaintiff's reputation can never accurately be ascertained or compensated by money damages. *Chips 'N Twigs, Inc.*, 414 F.Supp. at 1019.

53. Plaintiff will be irreparably injured if injunctive relief is not granted by this Court.

### BALANCE OF HARDSHIPS

54. As defendants have not yet become operational and have not advertised or promoted the DOMINION BANK name or service mark, and as plaintiff has been using the mark since 1971, and through its predecessor in interest since 1890, and has invested substantial sums of money in promoting and advertising the name, and has

---

**1.** Plaintiff presented the testimony of Professor Jack M. Guttentag, a Professor of Finance at the Wharton School of the University of Pennsylvania. Defendants submitted by deposition the testimony of Mr. Allan S. Kalish, an advertising and marketing consultant in Philadelphia, and of Mr. David P. Lazar, First Vice President of Ryan, Beck, & Co., a Philadelphia investment banking firm. Each expert offered his opinion as to the significance of plaintiff's presence in the Pennsylvania market and the likelihood of confusion between plaintiff's and defendants' name and service mark.

built up goodwill and a reputation associated with that name, the equities favor the award to plaintiff of a preliminary injunction.

## THE PUBLIC INTEREST

55. The trademark law exists for the protection not only of the producer of goods or the provider of services, but of the consumer as well.

56. A preliminary injunction will protect Pennsylvania consumers from confusion or deception with respect to the services they will receive from an entity known as DOMINION BANK. *McNeil Laboratories, Inc. v. American Home Products Corp.*, 416 F.Supp. 804, 809 (D.N.J.1976).

57. A preliminary injunction will likewise protect those who provide goods and services to the banking industry from confusion and deception.

## LACHES

58. Defendants have not proven that plaintiff had knowledge of defendants' infringement yet inexcusably delayed prosecution of its rights, nor that defendants will suffer prejudice.

59. Defendants have not established the affirmative defense of laches.

## CONCLUSION

60. Plaintiff has established that it has a reasonable probability of success on the merits and that it will be irreparably injured if preliminary relief is not granted. In addition, the harm to plaintiff from the denial of preliminary relief greatly outweighs the inconvenience to defendants of its issuance, and the public interest will be best served by a preliminary injunction.

An appropriate Order follows.