PERFUMANIA, INC. Plaintiff,

v.

PERFULANDIA, INC., Zahatiel Zeballos, Jane Doe, and the conjugal partnership constituted between them, Richard Roe and "ABC" Corporation, Defendants

No. CIV. 02–2733 (CCC/ADC).

United States District Court,
D. Puerto Rico.

Aug. 14, 2003.

Jesús E. Cuza–Abdala, Ina M. Berlingeri–Vincenty, Goldman, Antonneti and Córdova, San Juan, for plaintiff.

Luis G. Salas–González, Cabrera & Rico, San Juan, for defendant.

## OPINION AND ORDER

DELGADO–COLON, United States Magistrate Judge.

### I. Factual and Procedural Background

On November 26, 2002, Perfurmania, Inc. (hereafter "Perfumania") filed an action against Perfulandia, Inc. (hereafter "Perfulandia") and Zahatiel Zeballos (hereafter "Zeballos") alleging violations under the Trademark Infringement and Trademark Dilution Act. Jurisdiction is invoked under Title 28 U.S.C. § 1332(a)(1) since the matter in controversy exceeds $75,000, exclusive of costs and interest. The Court's supplemental jurisdiction under Title 28 U.S.C. § 1367(a) is also claimed. Venue is proper in this jurisdiction under Title 28 U.S.C. § 1391(a), (b)(1), inasmuch as the defendants reside in this jurisdiction and a substantial part of the events giving rise to this action have taken place within our District (**Docket No. 1**).

Perfumania is a Florida corporation with its principal place of business in Miami, Florida, that owns and operates chains of retail perfume shops (**Docket No. 1**, p. 5). Its first retail shop opened in April 1987 in Miami, Florida, and as of February 2002 it

operated a nationwide chain of 247 retail stores specializing in the sale of fragrances at prices below the manufacturer's suggested retail prices. In Puerto Rico, Perfumania operates fourteen (14) retail stores having opened its first local store in 1995 (**Docket No. 1**, pp. 11–12).

Perfulandia is a closely-held corporation organized in August 2002 under the laws of Puerto Rico, where it holds its principal place of business (**Docket No. 1**, p. 6). It opened its first store in June 2002, and as of December 2002 had opened six (6) stores within the jurisdiction. Defendant Perfulandia is also engaged in the retail sale of fragrances at discount prices.

Co-defendant Zeballos is a United States citizen, resident of Puerto Rico, who at the inception of this action performed as the General Manager for the Perfulandia stores. Zeballos began working for Perfulandia at some point in mid or late 2002. Prior to that and until February 19, 2002, Zeballos had been employed and held the position of District Manager in Puerto Rico for plaintiff Perfumania. While so employed by plaintiff, Zeballos was responsible for supervising the managerial and operational structure of Perfumania in Puerto Rico.

Both parties compete in the discount perfume market with stores located mainly in malls and shopping centers in the island.

On December 20, 2002, plaintiff Perfumania filed a Request for Preliminary Injunction and, thereafter, on January 16, 2003, moved for an urgent hearing on its motion and for injunctive relief (**Docket Nos. 4 and 5**). The matter was referred for disposition.

Plaintiff also asks this Court to enjoin defendants' use of the name "Perfulandia" and in support thereof contends that the name "Perfulandia" infringes on its registered service mark and trade name, generates unfair competition and creates a likelihood of confusion with plaintiff's registered mark "Perfumania."

Beginning in February 24, 2003, the parties were allowed to present evidence. Plaintiff Perfumania presented the testimonies of Donovan Chin, Chief Financial Officer;[1] María Espinosa, Real Estate and Legal Manager (**Docket No. 16**); Saul Kravec, Sales Vice President for Elizabeth Arden; José Acevedo–Rodríguez, Advertising Executive and owner of Retail Net; Rafael Meno–Ayala, District Manager for Perfumania;[2] Ana Alicia–Díaz, Supervisor, Vega Alta Perfumania store; Javier Negrón–Ortiz, Assistant Manager, Plaza Las Américas Perfumania Store; Aileen Santiago–Torres, Manager, Centro Gran Caribe, Vega Alta Perfumania store (**Docket No. 17**).

Defendant Perfulandia presented the testimony of Mr. Rafael Almonte, owner and principal of Perfulandia stores (Docket No. 17). Upon concluding presentation of his testimony, the parties agreed to the issuance of a permanent injunctive relief[3] and other remedies.[4]

---

1. **Exhibit 8**: Business card.

2. **Exhibit 34**: Business card.

3. The parties consented to the jurisdiction of this Magistrate–Judge to dispose of the issue at bar and issue the corresponding restraining order providing for adequate relief for plaintiff (**Docket No. 19**). This is considered a partial consent while the trial jurisdiction of all other issues raised (i.e. contractual) in the complaint remain province of the District Court.

4. Other remedies the parties stipulated to include that defendants will change its name and trademark, color and stylized letters, color and structure, scent strip, letterhead, envelopes, stamp, marketing slogan, all within a term of thirty (30) days upon conclusion of

## II. Evidence at the Hearing[5]

Perfumania is a Florida corporation with its principal place of business located in Miami, Florida. It owns and operates chains of retail perfume shops and since incorporated in 1987, year in which its first retail store opened, it has exhibited a steady and significant growth across the nation (**Exhibit 1**). Actually, across the United States it operates a total of 239 retail stores and is considered one of the largest, if not the largest, chain of retail stores.[6] In 1988 the national sales were of approximately $3.2 million. This amount increased to $14.9 million in 1990, $185.3 million in the year 2000, and $199.2 million in the year 2002, for a total sales volume (from 1998–2002) of $1,420,041,000.00 (**Exhibit 2**) which accounts for in excess of five (5) billion transactions (**Exhibit 3**). Undoubtedly, its sales volume places Perfumania as a leading perfumery chain in the United States (**Exhibit 12**).

Generally, Perfumania coordinates its marketing from its central offices though additional promotional expenses are originated by funding marketing demands at different commercial locations. In 1988 Perfumania's promotional expenses were of approximately $75,000, amount that increased to $1.4 million in 2002. The total marketing expenses for the 1988–2002 period are estimated in over $16.7 million[7] (**Exhibit 4**). Other expenses incurred relate to lease required marketing expenses.[8] In sum, since 1995 Perfumania's constant growth has demanded a total promotional investment of over $18 million (**Exhibit 6**).

In sum, in marketing, Perfumania is widely known as a service mark,[9] first used in commerce in 1987, which it registered in 1989 and has consistently used its mark, promotional slogan and same distinctive corporate letterhead, scent strip and bags (**Exhibits 7–12; Docket No. 3**: Request for Preliminary Injunction, Exh. A). It appears that the consistency with which its mark and trade practices have been marketed constitutes an essential component of Perfumania's success and public acceptance. Because of its prestige, different private and governmental commercial and public entities frequently seek Perfumania's presence within its facilities[10] and is so mentioned in national publications (**Exhibits 21 and 26**). More so, as attested by Saul Kravec, ("Mr.Kravec") Sales Vice President for Elizabeth Arden, a fragrance designer, Perfumania has the most recognizable name among all perfume discount retail stores within the United States. At

the evidentiary hearing. (*See* **Docket Entries No. 16, 17, 18.**)

5. Having thoroughly examined the evidence presented at the hearing and having made the corresponding credibility assessment, these are the facts deemed proven at the hearing.

6. **Exhibit 16**: Perfumania Store Directory.

7. **Exhibit 4**: Total cost of marketing efforts coordinated from and through Perfumania central offices.

8. Perfumania's national annual leased marketing expenses during 2002 amount to $915,048.00. *See* **Exhibit 5**.

9. Perfumania is a service mark. A service mark is defined as "a mark used in the sale or advertising of services to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source, even if that service is unknown." 15 U.S.C.A. § 1127(2002).

10. **Exhibit 17**: Request by Harligen Area Chamber of Commerce, Texas; **Exhibit 18**: Request by the Terranomics Retail Services regarding a location at Fairmont Hotel in San Francisco, California; **Exhibit 19**: Market Place Development promoting leasing opportunity at the Seattle Airport; **Exhibit 20**: Leasing offer made by Newark New Spectrum, New York. See also testimony of María Espinosa.

the same time, Mr. Kravec recognizes Perfumania's name is extremely strong and possesses a mark that is widely known within the industry. It was Mr. Kravec's opinion that there is no other discount perfumery business with as many locations throughout the United States.

As it relates to Perfumania's marketing strategies in Puerto Rico, it is undisputed that the Puerto Rico district is one of the most profitable markets per store. (Testimony of Donald Chin.) In Puerto Rico, the first store opened in 1995. Since then the number of stores within the main shopping centers in the northern part of the island has increased from ten (10) in 1998 to fourteen (14) in 2002 (**Exhibit 13**). Perfumania continues to research for new locations. While the sales volume in the Puerto Rico stores amounted to $18,625,000 in 2002 for the seven-year period (1995–2002), the total sales of Perfumania in Puerto Rico accounted for a profit of $67,998,539 [11] (**Exhibit 14**).

In turn, a significant segment of Perfumania's advertising campaign in Puerto Rico was carried by Retail Net, a corporation owned by José Acevedo–Rodríguez (hereafter "Acevedo"). Retail Net was in charge of deploying Perfumania's marketing campaign by resorting to radio (**Exhibits 27, 28 and 31**), television (**Exhibit 25**) and other mechanisms, such as, fashion magazines and public relations activities (**Exhibit 26**). Nationwide and locally Perfumania's slogan was that of "genuine fragrances at incomparable prices."

Within Perfumania's organizational structure, the local operations of the District Managers, nationwide, are reported to Mrs. María Espinosa (hereafter "Ms. Espinosa"), who performs as the Real Estate and Legal Manager for Perfumania. She is responsible for the negotiation and execution of contracts dealing with real estate matters, establishment of corporate offices and retail. stores. Further, Ms. Espinosa remains the key liaison between landlords and commercial business establishments and Perfumania and coordinates and participates in the decision making process of Perfumania's development and litigation, be it contractual or trademark related issues. Ms. Espinosa personally oversees and participates in the investigation of reports regarding trademark infringement as reported within the twenty-six (26) districts she supervises.

During her testimony, Ms. Espinosa specifically alluded to Perfumania's establishment and development in Puerto Rico since July 1995 through February 2002. During this period, Zahatiel Zeballos (hereafter "Mr. Zeballos") had been designated and performed as the District Manager for Puerto Rico [12] and as such both remained in constant communication. During his tenure, Mr. Zeballos zealously represented Perfumania's interests against potential infringers. In support of her statements, Ms. Espinosa recounted an event transpired in 1999 in which Mr. Zeballos reported a possible trade infringement by a business operating under the

11. See also, **Exhibit 15**: Annual Number of transactions Perfumania Puerto Rico.

12. The District Manager is responsible for supervising, guiding and auditing the daily activities of its district's stores. He is responsible for maximizing sales and profitability while controlling expenses, maintaining and enforcing company standards, participating in the design and implementation of hiring, training, selling, merchandising, marketing, loss prevention and operational policies. In regards to planning and budgeting, the District Manager assists the Corporation in developing annual budgets, develops and communicates new merchandising strategies for individual stores, develops timing and action plans and reviews the progress of all implemented strategies (**Exhibit 22**).

name of "Perfumería." While this event as some others similarly reported had been investigated, most have been solved at an informal level without need of resorting to litigation.

In discharging his duties as District Manager for Perfumania, Mr. Zeballos participated along with Acevedo, owner of Retail Net, and other corporate representatives in designing the slogan,[13] marking, promotional and merchandising strategies within our district. Undoubtedly, Mr. Zeballos was privy to Perfumania's business and operational strategies. According to Mr. Acevedo, since 1995 and while Zeballos performed as District Manager Perfumania steadily increased its advertising expenditures from $24,372.00 in 1995, year in which the radio advertising campaign was initiated, through the year 2002 during which the expenditures were rated at $381,332.00. During the seven-year period such expenditures have at least been doubled annually [14] (**Exhibit 24**). Mr. Acevedo, being responsible for Perfumania's local advertisement campaign, considers that Perfumania has an institutional benefit: that consumers are given the best perfumes at the best prices. This has turned into Perfumania's slogan essence (**Exhibit 25**) and said message has been consistently conveyed to consumers through different media, more so during the so called "high seasons" which were identified as the periods of time prior to or during Valentine's Day, Mother's Day, Father's Day and Christmas Season (**Exhibit 25A**). The evidence shows that while in office, Mr. Zeballos was privy to and participated in the design and implementation of the Perfumania's store designs, merchandise layout, advertisement campaign and deployment of advertising and sales strategies, and he was also privy to Perfumania's trade secrets (**Docket No. 3**: Exhibit B, Section VII, No Competition Contract, para. 3(D)).

Mr. Zeballos' employment was terminated by Perfumania in February 2002. At the time a "no competition" agreement was signed which in essence provided that:

### SECTION SEVEN COVENANT NOT TO COMPETE

This Covenant Not to Compete is made and entered into by and between ("Employee") and ("Perfumania") collectively the "parties". This Agreement shall become effective as soon as it is signed by both parties.

1. Employee was employed by Perfumania as a District Manager for the District of Puerto Rico.

2. The Employee recognizes that in each of the highly competitive business in which Perfumania is engaged personal contact is important in securing new customers and in retaining the accounts and good will of present customers. Personal contact is a valuable asset and is an integral part of protecting the businesses of Perfumania. The Employee recognizes that his position required him to have substantial contact with Perfumania customers, suppliers and prospective customers, for that reason he is in a position to take for his benefit the good will Perfumania presently has as well as the good will that Perfumania paid Employee to develop and maintain for Perfumania's benefit. The Employee also had access to Perfumania's confidential information and trade secrets, as de-

---

13. Mr. Acevedo testified it had taken him and others collaborating on the project almost a week to come up with the slogan that was finally adopted by Perfumania.

14. The total expenditures from 1995 to 2002 amount to $1,461,549 (**Exhibit 24**: Distribution Chart).

scribed in paragraph 3(D). IF after leaving Perfumania's employment, Employee takes advantage of such confidential information and proprietary information, then the competitive advantage that Perfumania created through its efforts and investment will be irreparably harmed. For these reasons, the Employee agrees that he will not engage in any competitive activity.

3. The Employee acknowledges that consideration for this Agreement, as set forth herein, has been provided by Perfumania, and is adequate and sufficient. The twenty eight thousand dollars ($28,000.00) provided to the Employee as a separation payment under this Agreement and General Release constitutes adequate and sufficient consideration. In exchange for the aforesaid consideration, the Employee agrees to the following restrictions:

A. Restricted period.

1. The Restricted Period for non competition shall begin on the effective date of his termination and shall continue until sic (6) consecutive calendar months after said termination, regardless of the reason for termination (including involuntary termination).

2. The restricted period for non solicitation of clients or employees shall begin from the date of signing this agreement and shall continue until twelve (12) months from the date of the signing of this agreement.

Notwithstanding, the evidence shows that shortly after February 2002, when Zeballos had terminated his employment relationship with Perfumania, he met Rafael Almonte–Ramírez[15] (hereafter "Almonte"), whom Zeballos had known for over twenty (20) years because of previous business relationships.[16] Coincidentally, Almonte claims that by the time he met Zeballos he already wanted to expand his business operations. Reportedly, Almonte offered Zeballos the opportunity of working for him, an offer that was allegedly declined by Zeballos in view of his no competition agreement with Perfumania. However, contemporaneously, that is by May 2002, Zeballos had agreed to assist Almonte in supervising the personnel and operations of the first store owned and newly opened by Almonte.[17] This store operated under the name of "Perfulandia." This name, Almonte claims, was chosen by him, inasmuch as he wanted to create a retail store chain of "some impact" and for the same to be "perfume related." Initially, Almonte claims he considered the name "Perfuland," later, while searching in the Internet, he realized the name was already being used and thus considered its translation into Spanish, "Perfulandia," was a name that "sounded nice" and "looked pretty" to him.

The evidence clearly shows that since opening his first store in June 2002, Perfulandia has opened five (5) other stores along the main commercial malls in the island. Actually, except for a store located

---

15. **Exhibit 34**: Business card.

16. Almonte testified he has eighteen (18) years of experience in the wholesale business. He began by conducting house to house sale of perfumes and clothing, then sold similar products to retail stores until 1994 when he bought a locale from which he began his retail sales. At the time Almonte owned and operated "Perfumería Mona–Lisa" engaged in

the retail sale of perfumes. At the same time Almonte owned and managed a wholesale perfumery sales business under the name of "R.A. Fragrance."

17. Almonte testified that Zeballos was indirectly compensated for his assistance and support, inasmuch as Almonte paid for Zeballos' health insurance premium and car loan.

at Dr. Vive Street in Bayamón, all other Perfulandia stores have opened and are located at the same and exact locations where Perfumania has its stores. Curiously, the Perfulandia store located at Dr. Vive Street is situated in the same physical facilities where Perfumania used to operate one of its stores. Perfulandia rented the same facilities and coincidentally uses the same furniture and equipment left behind by Perfumania when it concluded its lease for those premises. Interestingly, the record remains void of any studies or market analysis that would have led Almonte to identify the best locations for its stores.

During his testimony Almonte, while refusing to acknowledge the similarity of both marks, reluctantly admitted in cross-examination that the "type" and "coloring" of his mark is similar to that of Perfumania (**Exhibit 29 and 30**). Perfulandia's scent strip and slogan undoubtedly highly resembles that of Perfumania (**Exhibit 27**). Perfulandia's advertising campaign also resembled that of Perfumania (**Exhibits 27, 29–30 and 33**). Admittedly, Zeballos began to work on a full-time basis as Perfulandia's District Manager in December 2002. Reportedly it was Zeballos, who in a matter of minutes, came up with the business slogan for Perfulandia ("original perfumes at outlet prices") and the one who has negotiated most of the lease contracts with the landlords for the placement of the Perfulandia stores, this of course being the same landlords which he dealt with while performing as District Manager for Perfumania. Except for the fact that

Perfumania sells products such as body lotions and hair care products, Almonte also acknowledged both chains do sell perfumes and fragrances, though some of the fragrances may be sold by either one but not both.[18] As such, the clientele or targeted market for Perfumania and Perfulandia is the same.

Perfulandia's mark in extremely similar to Perfumania's mark. The color and stylized letters used by Perfulandia in its mark PERFULANDIA are identical to those used by Perfumania in its registered mark, PERFUMANIA (**Exhibits 29 and 30**). Also, Perfulandia opened five (5) of its six (6) stores in malls where Perfumania currently operates its stores. Perfulandia's sixth store opened within premises where Perfumania has previously opened and continues to operate a PERFUMANIA store. Notably, the furniture that Perfulandia uses at the Dr. Vive location is that which was left behind by Perfumania when it concluded its lease for those premises. All stores at the different locations are within walking distance from each other.

The evidence clearly shows that Perfulandia began to use the same type of marketing strategies that Perfumania had been using in Puerto Rico for years (i.e., radio commercials, newspaper ads, in-store advertising, and print marketing in "shoppers"),[19] with a slogan that is very close to Perfumania's slogan in Puerto Rico (**Exhibits 27 and 28**). In Puerto Rico Perfumania uses the slogan in Spanish "*Per-*

18. Almonte admitted having visited the Perfumania stores on multiple occasions and seen products such as body lotions and gels, nail polish and, hair brushes which are products not available at Perfulandia. He claims occasionally Perfulandia was the first to merchandise in Puerto Rico products such as "Ignition," "Forever" and others products produced by manufactures including Eliza-

beth Arden (**Exhibit 23**: list of products available within Perfulandia stores not available at Perfumania).

19. In Puerto Rico, however, Perfumania has an aggressive television commercial campaign. Perfulandia does not use this form of advertising.

*fumes originales a precios incomparable"* (original perfumes at incomparable prices), while Perfulandia uses as its slogan *"Perfumes genuinos a precios de outlet"* [20] (genuine perfumes at outlet prices) (**Exhibits 26 and 31**).

Soon after the operation of the PERFULANDIA stores began, Perfumania's Puerto Rico district managers began to inform Mary Espinosa, Perfumania's Manager for Real Estate and Legal Matters, and other people at Perfumania's corporate offices in Miami, Florida, about customer confusion being caused by the PERFULANDIA mark. The confusion was such that customers who had previously purchased merchandise at a Perfulandia store attempted to return it to a Perfumania store, believing that both businesses were either affiliated or the one and the same. Similarly, customers' confusion was evident when attempting to redeem purchase coupons being offered by Perfulandia.[21] Further, customers' confusion was generated by Perfulandia's promotional campaign that resembled that of Perfumania, similar offerings, resemblance of its stores and layouts and type and coloring of its sign. The existing level of confusion was apparent to Perfumania personnel through its clients' versions while narrating incidents that clearly indicated Perfulandia employees were taking advantage of and not dispelling the clientele's erroneous beliefs that both stores were either the same or affiliates.[22] Because of Perfumania's increasing concerns regarding customers' confusion, Mr. Acevedo was asked to and designed a promotional campaign alerting customers not to be distracted or misled by "impostors" [23] (**Exhibit 31**). In spite of Perfumania's efforts through advertising campaign and encouraging employees to generate customers' awareness as to the existence of different commercial entities, the confusion remained. Thus, clients continued to walk into Perfumania stores carrying Perfulandia "shoppers,"; complaining about being mistreated by employees "at the other store" while actually referring to the nearby Perfulandia store; being misled by Perfulandia employees into believing it was the same store;[24] clients' complaints that the "other Perfumania store on the second level" did not want to honor a promotion coupon.[25] All these incidents revealed that while frequently visiting the Perfumania stores, the high resemblance of Perfulandia's mark,

20. In Puerto Rico, Perfumania uses both the Spanish slogan mentioned above and the English, nationwide slogan previously mentioned in this opinion.

21. Testimony of Rafael Memo–Ayala, District Manager for Perfumania and Javier Negrón–Ortiz, Assistant Manager for Plaza Carolina Shopping Mall (**Exhibits 32, 33 and 34**). Their testimonies are further corroborated by that of Arleen Santiago–Torres, Manager for Perfumania Store at Centro Gran Caribe Sur in Vega Alta.

22. Javier Negrón–Ortiz, District Manager for the Plaza Carolina Perfumania store, narrated that a female client of his once mistakenly walked into one of Perfulandia stores, asked for him, inasmuch as she had not seen him for some time, and was told by a Perfulandia employee that "he was no longer with the company." Subsequently, this same person visited the Perfumania store where he worked and upon encountering each other reported what had transpired at the Perfulandia store. (Testimony of Javier Negrón–Ortiz.)

23. While in the advertisement no direct mention of Perfulandia was made, Acevedo assured he had selected the phrase "Cuidado con los impostores" in order to draw consumer's attention and preclude Perfulandia's attempts to take over Perfumania's name and image.

24. Testimony of Ana Victoria Alicea–Díaz, Supervisor for Perfumania at Centro Gran Caribe Sur at Vega Alta.

25. *Id.*

display and store layout did not allow for many clients to be able to make the distinction between the Perfumania and Perfulandia stores (Exhibits 23 and 32).

Once all incidents reported were investigated and corroborated, legal action was pursued.

## III. Injunctive Relief: Legal Standard

■ According to the First Circuit Court of Appeals, a party seeking a preliminary injunction must satisfy a four-prong test. Under this framework, trial courts must consider:

1. The movant's substantial likelihood of success on the merits.

2. Potential for irreparable harm if the injunction is denied.

3. Whether the balance of hardships weighs in movant's favor.

4. The effect the court's ruling will have on the public's interests.

*See I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 33 (1st Cir.1998), *citing TEC Eng. Corp. v. Budget Molders Supply, Inc.,* 82 F.3d 542, 544 (1st Cir.1996); *Ocean Spray Cranberries, Inc. v. PepsiCo., Inc.,* 160 F.3d 58, 60 (1st Cir.1998); *DeNovellis v. Shalala,* 135 F.3d 58, 62 (1st Cir. 1998); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996), *citing Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991).

Thus, this Court must grant injunctive relief if it finds there is substantial likelihood that Perfumania will prevail on the merits of its infringement claims and is subjected to potential irreparable harm were relief to be denied.

## A. Likelihood of Plaintiff's Success on Its Claims of Trademark and Service Mark Infringement and Unfair Competition and Dilution Claims

■ At the stage of preliminary injunction, a trial court need not predict the eventual outcome of a case with absolute certainty, but rather make a statement as to the probable outcome of the case. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d at 16; *Narragansett Indian Tribe v. Guilbert,* 934 F.2d at 6. Under this scenario, plaintiff's claims are to be considered in terms of its likelihood to prevail or succeed on the merits.

### 1. Basic Trademark Protection Under the Lanham Act and the Federal Trademark Dilution Act

■ Trademark law is generally seen as serving two distinct yet equally important policy interests. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163–164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). The first is to prevent confusion, mistake or deception of consumers. 15 U.S.C. § § 1114(1)(a), 1125(a) (2002). *Lund,* 163 F.3d at 35 ("[a] primary purpose of trade dress or trademark protection is to protect that which identifies a product's source."). *See Qualitex Co. v. Jacobson Prods.,* 514 U.S. at 162, 115 S.Ct. 1300. A second yet equally important purpose of trademark law is to preserve fair competition and the owner's goodwill investment in its mark and business. Indeed, it has been held that the Lanham Act was enacted by Congress precisely to serve the important purpose of protecting the trademark owner's goodwill. *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 636 (1st Cir.1992). *See Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 218 (1st Cir.1989). *See also* S.Rep. No. 1333, 1946 U.S.Code Cong. Serv. at 1274

("where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats").

In achieving those purposes, trademark law generally seeks to prevent one seller from using a "mark" identical or similar to that used by another seller in a way that confuses the public about the actual source of the goods or services in question. *Star Fin. Services, Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir.1996). Such confusion may prevent the buyer from obtaining the goods he seeks or may endanger the reputation of the first user of the mark by association with the subsequent user. *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir.1992).

■ On the other hand,. the Federal Trademark Dilution Act (hereinafter "FTDA") grants protection to "famous" marks against any use of the mark that "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c) (2002).

The FTDA protects only the trademark owner and is not concerned with possible confusion on the part of consumers. *Lund Trading v. Kohler,* 163 F.3d at 36. "Antidilution statutes have developed to fill a void left by the failure of trademark· infringement law to curb the unauthorized use of marks where there is no likelihood of confusion between the original use and the infringing use." *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 30 (1st Cir.1987)[26].

Section 43(a) of the Lanham Act states in relevant part:

(1) Any person who, on or in connection with any goods or services uses in commerce any word, term, name, symbol, or device ... which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by

**26.** Before we delve into a discussion regarding plaintiff's likelihood of success on these two claims, however, it is pertinent to note that this litigation involves a service mark. A service mark has been previously defined as "a mark used in the sale or advertising of services to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that service is unknown." 15 U.S.C.A. § 1127 (2002). On the other hand, a trademark is defined as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods. even if that source is unknown." 15 U.S.C.A. § 1127 (2002). *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 n. 1 (1st Cir.1989). In both cases, "the marks are used to indicate *the distinctive source* of the goods or services, even if that source is un-

known." *Id.* (emphasis added). *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 n. 1 (1st Cir.1987) [hereinafter "VW"].

Despite the noted difference between service marks and trademarks, courts generally do not distinguish between these two in their analysis of infringement claims. *See, e.g., Boston Athletic,* 867 F.2d at 24 n. 1; *VW,* 814 F.2d at 815 n. 1. On the contrary, case law involving both service marks and trademarks are routinely applied to service mark infringement cases such as the present one. *Id. See also The Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO, v. Winship Green Nursing Ctr.,* 103 F.3d 196, 199 n. 2 (1st Cir.1996) [hereinafter "IAM"]. At the evidentiary hearing plaintiff concentrated its efforts towards establishing the trademark infringement. Thus, at this juncture and based on the evidence presented only plaintiff's trademark infringement claims under the Lanham Act will be addressed.

any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(200).

■ In addition to the prerequisites stated in the previous section, to prevail on a trademark infringement claim, a plaintiff must also show: "(a) that he uses, and thereby 'owns,' a mark, (b) that the defendant is using that same or a similar mark, and (c) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." *Star Fin. Services, Inc. v. AAS-TAR Mortgage*, 89 F.3d at 9. *See Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 121 (D.Mass.1999), *aff'd*, 232 F.3d 1(1st Cir.2000). We discuss these factors seriatim.

### a. Use and Ownership of Mark at Issue by Plaintiff

■ In this case, plaintiff is clearly the senior user of the marks at issue. As stated above, plaintiff began to use the trademark Perfumania® in commerce as early as 1987 (Exhibit 7). Plaintiff's several trade and service marks were registered over ten years ago and before defendants began to use the name Perfulandia in commerce in the latter part of 2002. Perfulandia is not a registered mark with the U.S. Patent and Trademark Office. It is only registered before the Commonwealth Department of State as a corporation authorized to do business under the laws of Puerto Rico.

The Lanham Act provides that the registration of a mark on the principal register constitutes prima facie evidence of the validity of the registered mark and the owner's exclusive right to use the registered mark in commerce on the goods or services specified in the registration. 15 U.S.C. § 1115(a). These registrations are therefore prima facie evidence of plaintiff's ownership in the mark and its exclusive right to use the Perfumania mark.

The evidence is clear in that plaintiff owns the validly registered service mark Perfumania (**Exhibit 7;** and Docket No. 3: Request for Preliminary Injunction, **Exhibit A**). The evidence also shows that plaintiff has been using said trade name in commerce uninterruptedly since at least 1988, when it opened its first perfume retail store. To date, plaintiff operates under the Perfumania name in approximately 239 stores in 34 states, including the District of Columbia and Puerto Rico (**Exhibit 1**).

Once plaintiff registered its marks, defendants were put on constructive notice of the claims of ownership in said registered marks. 15 U.S.C. § 1072 (2002). As explained by this Court, "[t]he effect of this constructive notice is that the use of a mark which is the same or confusingly similar to plaintiff's mark, as stated in its federal registration certificate, cannot be justified by a claim of innocence, good faith or lack of knowledge on the part of a junior user." *Geoffrey, Inc. v. Toys 'R Us*, 756 F.Supp. 661, 665 (D.P.R.1991). Further, "[o]nce the registration is effected, national protection is afforded and 'no subsequent adoption and use of the same or a similar mark for the same or similar goods can be justified on a claim of good faith." *Id.* at 665–666 (quoting *Davidoff Extension S.A. v. Davidoff Comercio E Industria Ltda.*, 747 F.Supp. 122, 127 (D.P.R. 1990)).

### (b) Use by the Defendants of a Similar Mark

Defendants began to use the name Perfulandia in commerce on or about June, 2002. As of December, 2002, defendant operated six perfume retail stores in Puerto Rico. Not only does the name Perfulandia have a similar sound, appearance, and meaning to Perfumania®; but its name appears in the same font, letter size and

color as that of Perfumania. More so, Perfulandia provides identical services and utilizes an identical marketing concept as that of Perfumania. Both Perfumania and Perfulandia target the same market.

The evidence specifically demonstrates that defendants' stores bear the name Perfulandia, in exactly the same stylized form and color used in connection with plaintiff's registered mark Perfumania® (**Exhibits 25, 28–30**). Furthermore defendants use the same basic store design and window displays as does plaintiff (**Exhibits 29 and 30**). Defendants also use signs and merchandise displays similar to the ones used in plaintiff's stores, which includes price tags comparing the manufacturers' suggested retail prices with Perfulandia's prices. The layout design of the tags is almost identical to the ones used by plaintiff and are displayed in the same colors (red and white). Reportedly, to advertise its discounts, defendants uses similar posters to the ones used by plaintiff, including the same basic layout and the placement of the store name in the same segment of the poster and in the same stylized format.

Finally, it must be noted that Perfulandia's scent strip and advertising slogan are almost identical to those of Perfumania. Also, as is the case with plaintiff's stores, the Perfulandia stores are "full-service" with similar number of employees providing similar types of services to its clientele.

### (c) Defendants' Use Confuses the Public, Thereby Harming Plaintiff

■ The third requisite for trademark infringement is likelihood of confusion. In making an assessment on whether there exists likelihood of confusion, the Court of Appeals for the First Circuit has typically referred to the following eight factors:

(1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; (8) the strength of the plaintiff's mark.

*Star Fin. Services, Inc. v. AASTAR Mortgage*, 89 F.3d at 10; see also *Lund Trading v. Kohler*, 163 F.3d at 43. However, while all must be considered by a trial court, "[n]o one factor is necessarily determinative." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir.1987).

We now proceed to discuss the facts of this case in light of these eight factors in order to demonstrate that the element of likelihood of confusion is met.

### (1) Similarity of the Marks

As the court observed in *Pignons*, "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981). To be sure, "[w]ords may be recognized as similar because of sound, appearance, and meaning, and a finding of similarity may be based on appearance alone." *Volkswagenwerk Aktiengesellschaft v. Wheeler* 814 F.2d at 817 *(citing Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980)).

This Court has also noted that "[i]n order to constitute an infringement it is not necessary that the trademark be literally copied. Neither is it necessary that every word be appropriated. There may be infringement where the substantial and distinctive part of the trademark is copied or imitated." *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, 537 F.Supp. 587, 595 (D.P.R. 1982) (quoting *Queen Mfg. Co. v. Isaac*

*Ginsberg & Bros.*, 25 F.2d 284 (8th Cir. 1928)).

Here, there is no question that plaintiff's and defendants' marks are similar in sound and appearance (same font, letter size and color). The impressions made on the ear, the eye and the mind by the words "Perfumania" and "Perfulandia" are extremely similar. Moreover, the two words have similar pronunciation, begin with the same five letters "Perfu-" and end with the same two letters "-ia," creating a probable and real confusion. In the context of this analysis, it has been held that "the initial letters and the last syllables [are] probably the parts of any word which impress themselves most firmly upon the memory." *Baker v. Simmons Co.*, 307 F.2d 458, 465 (1st Cir.1962) (quoting *LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2nd Cir.1946)). Thus, based on the "total effect" of the marks, the similarity between the two marks is quite strong and significant.

█ It has been repeatedly held that when a party has adopted a mark similar to one already in use, it has an affirmative duty to avoid any likelihood of confusion. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d at 29; V*olkswagenwerk*, 814 F.2d at 817. In the present case, defendants not only are not taking affirmative acts to avoid confusion, they are in fact *proactively inviting* such confusion by using within the same market area a similar mark attached to identical services and marketing concept, in an identical font, color and size. More so, from the incidents of confusion reported to Perfumania by some clients, it appears that the Perfulandia employees are actually taking advantage of said confusion in order not to lose a sale.

In sum, it is evident that the designations Perfumania® and Perfulandia are sufficiently similar such that prospective purchasers might be confused about the source of the services desired.

**(2) Similarity of Services**

Both plaintiff and defendants offer exactly the same services to the same target market: retail perfume services at discount prices. Thus, this factor indisputably indicates a likelihood of confusion. *Star Fin. Services v. AASTAR Mortgage*, 89 F.3d at 10. While defendants argue that Perfumania also sells body lotions and some other products not sold by them (Exhibit 30), the percentage of these products within the global or mail line of products (perfumes and fragrances) is not significant.

**(3) Channels of Trade; Advertising; and Classes of Prospective Purchasers**

In accordance with First Circuit precedent, these three factors are to be jointly considered. *IAM*, 103 F.3d at 204; *Star Fin. Services, Inc. v. AASTAR Mortgage*, 89 F.3d at 10 n. 3; *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 n. 5 (1st Cir.1995).

In interpreting these factors, this Court has explained:

Confusion over the nature of the parties' business relationship may be as objectionable for purposes of trademark infringement as is confusion between their goods. It is not necessary to conclude that the public be led to believe that defendant's products are produced by the plaintiff. It is not even necessary that the public know who the plaintiff is. What is required is that the ordinary purchaser, generally familiar with plaintiff's mark, is likely to believe that defendant's products are somehow related to, associated with, or sponsored by [plaintiff].

*Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.,* 537 F.Supp. at 595 (internal citations omitted).

In the instant case, the channels of trade and classes of prospective purchasers are identical. Defendants have "coincidentally" opened their stores in the same market area and within walking distance of Perfumania® shops. For example, defendants have opened stores in Plaza Las Americas, Plaza Gran Caribe, Plaza del Sol and Plaza Carolina shopping centers. Plaintiff operates stores in all four of these centers. Defendants also opened a store in Bayamón, within premises that had been occupied by plaintiff until earlier this year. These factors not only may lead to consumer's confusion but have actually led to confusion as reported to Perfumania (**Exhibits 30 and 32**).

It is evident that both plaintiff and defendants target the same classes of prospective purchasers in the same geographical areas. They sell the same products, both at discount prices, and in the context of similar services with similar marketing strategies.

In addition, both advertise within their market areas. For example, plaintiff places in its stores posters in the similar stylizes letters which follow basically the same layout used by Perfumania®. Perfulandia, as Perfumania has done throughout the years also advertises its products by means of "flyers," discount vouchers, press and different magazines.

Consequently, it is evident that an ordinary purchaser, generally familiar with the mark Perfumania®, is likely to believe that Perfulandia is somehow related to, associated with, or sponsored by plaintiff.

**(4) Actual Confusion**

■ In suing under any of the three Lanham Act provisions, a plaintiff need only show that a likelihood of confusion is in prospect; a showing of actual confusion is not required. *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992). *See Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2nd Cir.1991) (construing Lanham Act § 32); *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 218 (1st Cir.1989) (same); *International Armament Corp. v. Matra Manurhin Int'l, Inc.,* 630 F.Supp. 741, 747 (E.D.Va.1986) (construing Lanham Act § 42); *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 160 (1st Cir.1977) (construing Lanham Act § 43). Indeed, the Court of Appeals for the First Circuit has explained that "[a] showing of actual confusion is not essential in order to find a likelihood of confusion." *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d at 818. *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d at 490; *Baker v. Simmons Co.,* 307 F.2d 458, 463 (1st Cir.1962). Accordingly, courts have routinely granted injunctions notwithstanding an absence of evidence of actual consumer confusion. *See, e.g., Pepsico, Inc. v. Giraud,* 7 U.S.P.Q.2D (BNA) 1371(D.P.R.1988); *Ferrero US.A., Inc. v. Ozak Trading, Inc.,* 753 F.Supp. 1240, 1247 (D.N.J.), *affd,* 935 F.2d 1281 (3rd Cir.1991).

In any event, there is evidence on record establishing that defendants' use of the marl Perfulandia has caused actual confusion among purchasers. For example,

a. customers who have entered the Perfumania® stores in the shopping centers where there are also Perfulandia stores, have asked about the "other" Perfumania® store, referring to the Perfulandia store (**Exhibit 30**);

b. customers have left a Perfumania® store commenting that if they chose

to purchase a certain item later, they could go to the "other" store, referring to the "Perfulandia" store;

c. customers have gone to Perfumania® to return items they have purchased at Perfulandia (**Exhibits 30 and 32**);

d. customers have complained of being treated in a discourteous manner at the "other Perfumania store" while actually referring to the Perfulandia store located within the same shopping mall (**Exhibit 32**);

e. a customer inquiring about a Perfumania employee while visiting a Perfulandia store; and

f. customers inquiring as to why both of "these" stores within the same mall had different prices (usually being higher at Perfulandia)(**Exhibit 30**).

While concerned about any adverse effect that the consumer's actual confusion could have had on its image plaintiff instructed its employees on how to respond to questions posed by customers which reflected the existence of confusion. *See Baker v. Simmons Co.*, 307 F.2d at 464 (the fact that the employee manual included information on how to deal with questions related to relationship with the infringing company sheds light as to doubtful state of the public mind on this question and on the frequency with which the question was raised).

## (5) Defendants' intent in adopting the mark

▮ Evidence of bad intent is not required in a trademark infringement case. *Star*, 89 F.3d at 11. Furthermore, the Court of Appeals for the First Circuit recently commented that courts should not give great weight to a finding of lack of intent in determining likelihood of confusion because the presence or absence of intent does not impact the perception of consumers whose potential confusion is at issue. See *Lund Trading v. Kohler*, 163 F.3d at 44.

Notwithstanding, courts begin with the proposition that a defendant, being a newcomer, has an infinity of marks to chose from. If he is aware of a plaintiff's mark and nevertheless chooses a closely similar mark, the courts tend to draw an inference of *intentional* infringement and likelihood of confusion. 3 Jerome Gilson, Anne Gilson Lalonde & Karin Green, *Trademark Protection and Practice* § 5.07[2][c], at 5–121(2001); *Volkswagenwerk Aktiengesellschaft v. Wheeler* 814 F.2d at 812.

Upon assessing the intent of a defendant, courts take into consideration the "previous contractual or business relations between the parties." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 432 (5th Cir.1984) (Defendant's prior role as plaintiff's distributor provided additional evidence of defendant's intent to trade on the plaintiff's goodwill). *See Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 n. 9 (5th Cir.1984); *Sun–Fun Products, Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 189 (5th Cir.1981). Indeed, courts frequently draw an inference of *wrongful intent* where the parties have had a previous business relationship. Gilson, Gilson & Green. *supra*, § 5.08[2], at 5–127; 3 R. Callman, *The Law of Unfair Competition Trademarks and Monopolies* § 82.2(b)(3) (3d ed.1969).

Similarly, when an alleged infringer intentionally copies a trademark, it may be presumed that he intended to cause confusion and profit thereby. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d at 34. This presumption is efficiently applied to cases such as the present one where competitors are involved. *IAM*, 103 F.3d at 206 n. 10.

In the case at bar, Almonte could not provide a coherent explanation on how he decided to choose the name "Perfulandia." He limited himself to state he had considered the name "Perfuland", though he could not recall exactly when and then having considered Perfulandia "looked nice." Almonte also enrolled defendant Zeballos who used to be employed by plaintiff as District Manager for Perfumania in the District of Puerto Rico area. Now, as District Manager for Perfulandia, Zeballos was in charge of supervising all aspects of Perfulandia's daily operations, sales and advertising strategies, operational structures and functioning. Furthermore, defendant Zeballos was privy to plaintiff's marketing and operational strategies, including store layout, use of comparative pricing tags, poster and flyer design, and general operational plans and guidelines. Indeed, during his employment as district manager, Zeballos had access to plaintiff's confidential and proprietary information crucial to the competitive advantage achieved by plaintiff. The evidence shows that Perfumania's promotional slogan was the result of at least one week of team work, with Zeballos being part of the team. In turn, it was Zeballos who in "minutes" came up with Perfulandia's slogan which highly resembles (inasmuch as it uses synonyms) Perfumania's slogan. Stores opened under a similar mark and used the same font and color and implemented a highly similar marketing concept, similar scent strip and business card. More so, it was Zeballos who negotiated the rental contracts with landlords on behalf of Perfulandia. Certainly, the methodology of doing so he had acquired while acting as District Manager for Perfumania.

It is apparent that Zeballos began to assist Almonte in establishing his first store at a time in which the "no competition agreement" [27] was still in force. Curiously, there is no explanation provided on market studies, advertising research that could have led Almonte to elect the exact location for his retail stores. However there is evidence showing that Zeballos was the one negotiating the lease contract with the landlords where the main Perfulandia stores are located. In this area Zeballos obviously had expertise inasmuch as said tasks he had performed in the past as Perfumania's District Manager.

The record also reflects that between June and December 2002 Almonte and Zeballos managed to have implemented a complete structural (layout), operational, promotional and advertising system while having opened six different stores. While Almonte's expertise in the wholesale business is not at issue, his ability to develop and establish a six-store chain of retail stores goes unexplained except for the fact that defendant Zeballos was acting as a principal and District Manager for Perfulandia. This as well constitutes the most plausible explanation as why the Perfulandia stores opened one after another (six stores in six months) under a similar mark used in exactly the same font and color

27. On or about February 19, 2002, plaintiff terminated Zeballos' employment. Upon termination, Zeballos signed a release whereby he agreed not to engage in any competitive activity in Puerto Rico within a period of six months after termination. He also agreed not to solicit plaintiff's employees or clients within a period of 12 months (**Docket No. 3**, Ex. B).

Defendants opened the doors to its first perfume retail stores within the six months after Zeballos was terminated. Those stores were opened in shopping centers where plaintiff operates its stores and/or in premises where plaintiff used to operate (near other existing Perfumania® stores).

and under a similar structural and organizational fashion.

In view of these facts, the Court can draw an inference of intentional infringement and likelihood of confusion for purposes of the injunctive relief.

### (6) Strength of the Mark

In assessing the strength of a mark, the elements to be considered are the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark. *Star Financial Svc., Inc. v. AASTAR Mortg. Corp,* 89 F.3d at 11; *Equine Technologies,* 68 F.3d at 547.

The strongest marks are those which are "arbitrary and fanciful," *Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1006 (D.Mass.1988). Secondary meaning can be established by evidence of long and exclusive use, the prominence of the plaintiff's enterprise, extensive advertising and promotion of the mark, and recognition of secondary meaning among the public. *Id.; Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d at 816.

The strength of a trademark is not decisive in an infringement inquiry. However, strong marks enjoy a broader and greater protection against infringement. *IAM,* 103 F.3d at 206; *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d at 819; *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d at 492.

The evidence demonstrates that plaintiff has been using Perfumania®, a duly registered mark, in an exclusive and uninterrupted fashion since 1987. As previously stated, during the past 15 years, plaintiff has spent over $16 million in advertising, promoting and developing its goodwill since it began to use the mark Perfumania® in commerce. Actually, Perfumania

continues to incur in such advertising at an average of more than $100,000.00 a month. Consequently, plaintiff has achieved prominence, selling more than $1,400,000.00 in products. In Puerto Rico it opened its first store in 1995, has opened 13 other stores thereafter and has developed a strong reputation and market.

Perfumania® is indeed recognized as a robust mark. Not only is it an arbitrary and fanciful mark, but it has achieved additional strength by means of the length of time the mark has been used and its national sales volume. It is renown as the main and largest perfume retail store in the nation. Its marketing strength is widely recognized by titles such as private developers, landlords, chambers of commerce, fragrance and perfume manufacturers and distributors. Therefore, it deserves trademark protection as a matter of law.

### B. There is Significant Risk of Irreparable Harm if Injunctive Relief is Not Granted

 A trademark plaintiff who demonstrates a likelihood of success on the merits creates a presumption of irreparable harm *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d at 640. Indeed, "irreparable harm maybe shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim." *Lund Trading,* 163 F.3d at 33. *See also Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1013 (D.Mass.1988).

In *Societe,* the Court of Appeals for the First Circuit explained:

By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trade-

mark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law.

*Id. See Keds Corp. v. Renee Intern. Trading Corp.,* 888 F.2d at 220; *Geoffrey, Inc. v. Toys 'R Us,* 756 F.Supp. 661, 668 (D.P.R.1991). Reducing the standard of proof for irreparable harm in trademark actions reflects the intent of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "to encourage commercial companies to act as the fabled 'vicarious avenger' of consumer fights." *Camel Hair and Cashmere, Inst. v. Associated Dry Goods Corp.,* 799 F.2d 6, 15 (1st Cir.1986).

In the case at bar, defendants' intention is to continue using the name Perfulandia is evident from the fact that recently a new Perfulandia store opened at the Plaza del Sol Mall. This store has opened, as the previous ones at a shopping mall where Perfumania has a store and is located at close proximity. Thus, Perfulandia has demonstrated a pattern that if continued at the same persistent path, will threaten and may constitute a real impairment to the strength of plaintiff's mark and to its interest in having exclusive control over the symbol of its own reputation. More so, Perfumania has been able to gather and present evidence on how the confusion generated by the Perfulandia name has led astray customers some of them even disgusted with disparate treatment and services received. While plaintiff has not presented specific evidence regarding loss of profit, it has certainly submitted testimonial and documentary evidence reflecting there is a significant risk its goodwill and reputation may continue to be negatively affected.

**28.** More so, if defendants' intent and motivations behind its business decisions were to be

## C. Balance of Hardships Weighs in Favor of Granting Relief

 Plaintiff has at stake the reputation of a trade name built up at enormous expense for over fifteen years. Indeed, plaintiff has invested millions of dollars in developing its goodwill in the United States and Puerto Rico. By contrast, defendants have been using the name "Perfulandia" for only six months.

If defendants are not restrained pending trial, the alleged commercial significance of plaintiff's trademark will be undermined with resulting loss of trade and customer goodwill, both of immeasurable nature. Therefore, it is evident that the balance of hardship, favors plaintiff in this case.[28]

## D. The Injunction Will Not Harm the Public Interest

 This Court has explained that "[a] trademark is understood to symbolize.., the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the domestic reputation earned for the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce." *Pepsico, Inc. v. Giraud,* 7 U.S.P.Q.2D (BNA) 1371(D.P.R.1988).

In the words of this Court,

[Defendants'] interim use of the almost identical trademark would be contrary to public interest if consumers associate a trademark with one particular producer. Then the use of that mark by another producer will mislead the public regarding the source of the merchandise.

scrutinized.

Customer confusion is by its very nature against the public interest.

*Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.,* 537 F.Supp. at 597 (citations omitted).

Therefore, the public interest in this case would be harmed *only if the injunctive relief is not granted.*

**SO ORDERED.**